Robert J. SHAFFER et al., Plaintiffs
and Respondents,

v.

HONEYWELL, INC., a corporation,
Defendant and Appellant,

and

A. J. Industries, Inc., a corporation, et
al., Defendants and Appellants.

Nos. 11635, 11637 and 11643.

Supreme Court of South Dakota.

Dec. 31, 1976.

252

Richardson, Groseclose, Kornmann & Wyly and Chester A. Groseclose, Jr., Aberdeen, for plaintiffs and respondents.

Davenport, Evans, Hurwitz & Smith and Ellsworth E. Evans, Sioux Falls, for defendant, appellant and respondent Honeywell, Inc.

Woods, Fuller, Shultz & Smith and John E. Simko, Sioux Falls, for defendants and appellants, A. J. Industries and Roberts-Gordon Appliance Corp.

May, Porter, Adam, Gerdes & Thompson and David A. Gerdes, Pierre, for defendant and appellant, Dunkirk Radiator Corp.

Siegel, Barnett, Schutz, O'Keefe, Ogborn & Jewett and Joseph H. Barnett, Aberdeen, for defendant, Northwestern Public Service Co.

WINANS, Justice.

These appeals arise from an action for damages occasioned by a fire and explosion in plaintiffs' home. The trial court found for the plaintiffs. We affirm.

Plaintiffs Robert and Jane Shaffer owned a home located southwest of Aberdeen, South Dakota. The house was situated adjacent to a greenhouse complex owned by Siebrecht Florist, Inc.; Robert Shaffer was president of that corporation. The corporation was engaged in raising and selling plants and flowers on a commercial basis. Proper temperature control was essential to the success of the enterprise.

Originally the greenhouse was heated by coal-fired, steam-generating boilers. In 1966 a natural gas-fired system was installed and the coal-fired system was retained as a standby unit. The Shaffer residence was heated by steam piped over from the greenhouse complex.

In 1969 the entire heating system was converted to gas, with natural gas supplied by defendant Northwestern Public Service Co. (NWPS) as the primary source of fuel, and a liquefied propane-air mixture supplied by an air mix plant as a secondary fuel source.[1] In conjunction with this conversion the Shaffers also decided to install a gas-burning furnace in their home.

After consultation with representatives of defendant Roberts-Gordon Appliance Corp., the Shaffers ordered a model G–5 Roberts-Gordon boiler for their house. It was represented that this furnace would function on both sources of fuel. Roberts-Gordon channeled the purchase order to defendant Dunkirk Radiator Corp., which manufactured that type of furnace under the Roberts-Gordon name.[2] Dunkirk shipped the furnace directly to the Shaffer home, crated but fully assembled.

Included as a component part of the furnace was a 100% safety shut-off valve (also referred to as a combination gas control) manufactured by defendant Honeywell, Inc. The function of the valve was to automatically terminate the flow of gas to the burners in the furnace should the pilot light go out.

To install the furnace it was necessary to lay a pipeline to the house, a distance of some 80 feet. The trench was dug by Siebrecht employees. NWPS employees welded, coated, wrapped, and tested the pipeline and laid it in the trench. Siebrecht employees made the connections at the greenhouse and the house and then covered the trench. They installed a manual shut-off valve and a pressure regulator just outside the house. In addition they installed a manual shut-off valve in the basement and then installed the furnace. The lines both inside and outside the house were soap checked for leaks. None were found. NWPS serviceman John Rombs then inspected the installations, made pressure checks, and initially set the furnace into operation in July 1969.

During December of 1969 it was necessary for NWPS to interrupt the flow of natural gas to some of its customers because of the nationwide gas shortage. When this occurred, NWPS provided plaintiffs with advance notice and the latter then switched to the L.P.-air mixture to heat both the greenhouse and the residence. After this switch they discovered that the furnace did not produce sufficient heat. On December 23, NWPS serviceman John Ell was sent to check the problem.

Ell examined the furnace and found the flues were sooted up. This had caused flames to emit from the front of the furnace. Ell cleaned the furnace and replaced some wiring and a small transformer that the flames had burned out. Ell also checked the pressure on the Honeywell valve and found it proper. After relighting the furnace, Ell found the flame to be out of adjustment. He determined that the L.P.-air mixture was too rich and so informed Mr. Shaffer. Steve Thorson, Siebrecht general manager and the Shaffers' son-in-law, subsequently made the required adjustment at the air mix plant. No further adjustments of the furnace or plant were made prior to the fire.

On January 6, 1970 Mr. Shaffer was called from a meeting by his wife. Her complaint involved the furnace. There was a smell of gas in the house when he arrived, especially in the basement. Upon entering the basement, Mr. Shaffer heard a hissing sound coming from the furnace and determined that it came from the Honeywell valve. He also noticed that the pilot light was out. When he closed the manual shut-off valve, the hissing stopped. He then ventilated the basement.

About 45 minutes later he returned to the basement to relight the pilot. There was

---

1. The air mix plant was manufactured by Algas Industries, Inc. and sold by R. C. Hanson, Co., a Minnesota firm which checked the installation of the plant. Installation was accomplished by greenhouse employees. Neither company is a party to this litigation.

2. Roberts-Gordon is essentially an order-taking agency. It is owned by defendant A. J. Industries, Inc., a New York holding company.

no hissing sound. He concluded the Honeywell valve had not functioned properly. On January 7th he contacted John Ell and asked him to check out the furnace, including the valve. After being told of the prior day's events, Ell was instructed to replace the valve if necessary. Accompanied by Steve Thorson, Ell recycled the valve about 10 times without producing a malfunction. He determined that everything was working properly and left without replacing the valve.

The Shaffers flew to Duluth on January 10, 1970 and continued to Minneapolis the next morning. Mr. Shaffer then flew to Detroit and Mrs. Shaffer returned to Aberdeen.

Approximately 8:00 a. m. on January 11, Thorson received an emergency call from a Siebrecht employee informing him that the air mix plant had broken down and that the heating systems had been switched to natural gas.[3] A motor mount on the plant had broken and had to be rewelded. Repairs were made and the pilot lights relit over the next two hours. Prior to returning the plant to operation, however, it was necessary to bleed the pipes to clear them of any excess air. During this process Linda Thorson, who had accompanied her husband to the complex, and Roy Gruenstein, a Siebrecht employee, were showered with an odorized L.P.-air spray.

Later that morning when Linda went to the airport to get her mother Mrs. Shaffer complained of the propane smell; Linda recounted the morning's events at the greenhouse. When they arrived at the house, Mrs. Shaffer commented on the temperature and Linda realized that no one had remembered to relight the pilot on the furnace. She immediately contacted Roy Gruenstein and requested that he do so. Although there was a gas smell in the house, it was attributed to Linda's propane-saturated clothing.

Gruenstein called John Ell of NWPS and received instructions on the proper procedure for relighting the furnace. He then went to the Shaffer home. Linda had already left. As he started down the stairs to the basement he first noted a propane smell. Mrs. Shaffer also noted the odor. Because Gruenstein had also been sprayed with gas that morning, he attributed the smell to his clothing.

While Mrs. Shaffer vented the basement, Gruenstein went to the furnace room. He heard no hissing sound. He determined that the pilot was out so he attempted to relight it according to his instructions. As he knelt down and struck a match to the floor, a big ball of flame engulfed him. The resulting fire and low order explosion did considerable damage to the Shaffer residence and personal property.

Plaintiffs commenced this action by summons and complaint on April 17, 1972. Liability was alleged under five causes of action: 1) res ipsa loquitur; 2) negligence; 3) strict liability; 4) breach of warranty; and 5) violation of statute. Trial was to the court and by consent of the parties was bifurcated into a liability phase and a damages phase. The liability phase concluded on November 15, 1973; in April 1974 findings were entered in favor of plaintiffs against all defendants except NWPS.[4] The latter was granted judgment against plaintiffs on its motion to dismiss the complaint and against Dunkirk dismissing its cross-claim.

Honeywell's liability was grounded on breach of warranty, negligence, and strict liability. Roberts-Gordon and A. J. Industries had liability founded on strict liability and on breach of implied warranty. Dunkirk was found liable as the manufacturer of the furnace under breach of both express and implied warranty. Because Roberts-Gordon, A. J. Industries, and Dunkirk were

---

3. This was during a time when the greenhouse complex had switched to its standby fuel supply because of the nonavailability of natural gas from NWPS.

4. At this stage of the litigation plaintiffs included the Shaffers individually, Mr. Shaffer as executor of the Siebrecht Estate, and St. Paul Fire & Marine Insurance Co. as a contractual subrogee. Western Fire Insurance Co. was added as a plaintiff during the damages phase.

without personal fault in that their liability was vicarious in nature, they were granted indemnity against Honeywell.

The damage phase commenced May 29, 1974 and concluded on July 8, 1974. Judgment was entered December 16, 1974 in favor of plaintiffs in the amount of $76,-415.33 plus 8% interest and costs. Honeywell perfected an appeal from the entire judgment (Appeal No. 11637). Roberts-Gordon and A. J. Industries appeal only from the trial court's decision not to award attorney fees as part of the indemnity award (Appeal No. 11635). Likewise, Dunkirk appeals only from that portion of the judgment (Appeal No. 11643).

Honeywell first attacks the sufficiency of the evidence to support the trial court's findings on the question of liability. We will not disturb those findings unless they are clearly erroneous.

"In making this determination we are mindful that it is incumbent upon this Court to be duly aware of the opportunity of the trial court to judge at first hand the credibility of the witnesses. See SDCL 15-6-52(a). As stated by this Court:

'In applying the clearly erroneous standard we must bear in mind that our function is not to decide factual issues de novo. The question for the appellate court is not whether it would have made the same findings the trial court did, but whether on the entire evidence it is left with a definite and firm conviction that a mistake has been committed.' *In re Estate of Hobelsberger,* 1970, 85 S.D. 282, 289, 181 N.W.2d 455, 459." *Cooper v. Hileman,* S.D., 1974, 222 N.W.2d 299, 300.

The crux of appellant's first contention is that the finding of a defect in the Honeywell valve is based purely on speculation and conjecture. We held in *Engberg v. Ford Motor Co.,* 1973, 87 S.D. 196, 205 N.W.2d 104, that the burden of proof lay with the plaintiff to show that there was a defect in the product at a time when the

defendant had possession, control, or responsibility for the condition of the product. A product is defective when it fails to perform reasonably and safely the function for which it was intended. *Engberg,* supra. No specific defect need be shown if the evidence, direct or circumstantial, permits the inference that the accident was caused by a defect. *Franks v. National Dairy Products Corp.,* 1969, 5 Cir., 414 F.2d 682; *Moraca v. Ford Motor Company,* 1975, 66 N.J. 454, 332 A.2d 599; *Hale v. Advance Abrasives Company,* 1975, Mo.App., 520 S.W.2d 656.

Of course the burden of proving causation also lies with the plaintiff. Causation may be established by circumstantial evidence where that evidence establishes by a preponderance, the probability that the accident was caused by a defect.[5] *Parham v. Dell Rapids Township of Minnehaha County,* 1963, 80 S.D. 281, 122 N.W.2d 548. We do not require that plaintiff eliminate all other possible explanations of causation that the ingenuity of counsel might suggest. It is sufficient that plaintiff negate his own and others' misuse of the product. *Daleiden v. Carborundum Co.,* 1971, 8 Cir., 438 F.2d 1017; *Friedman v. General Motors Corporation,* 1975, 43 Ohio St.2d 209, 331 N.E.2d 702.

In addition plaintiff has the burden of showing that the defect existed when the product left the manufacturer's hands. *Engberg,* supra. This burden may also be satisfied by circumstantial evidence. *Sweetman Construction Co., Inc. v. Dakota Pump, Inc.,* S.D., 1975, 226 N.W.2d 792. With these standards in mind we turn to the evidence presented.

Testimony shows that the Honeywell valve is designed to terminate the flow of gas to the furnace when the pilot light goes out. When the pilot fails a solenoid located inside the control unit is deactivated. By means of an electric impulse this causes the downward movement of a reset lever attached to a spring. The reset lever depress-

---

**5.** See also *Kleve v. General Motors Corp.,* Iowa 1973, 210 N.W.2d 568; *Lifritz v. Sears, Roe-* *buck and Company,* Mo.App., 1971, 472 S.W.2d 28.

es a latch knob which causes a nylon gear with cogs on the bottom to disengage and become freewheeling. When this gear freewheels, it permits the gas cock disc to rotate against the gas cock plate; the flow of gas terminates when these two parts rotate shut. A lubricant or grease is placed between the gas cock disc and plate to reduce friction and act as a sealant. There is a normal 30 to 40 second time lag in the process before the gas actually stops flowing. This lag period is characterized by a hissing sound.

Mr. Shaffer testified that on January 6, 1970 he heard a hissing sound coming from the Honeywell valve. He smelled gas in the basement and determined that the pilot light was out. When he manually shut off the gas, the hissing stopped.

Plaintiff introduced evidence in the form of expert testimony. Both experts were of the opinion that the valve did not close properly, thereby allowing gas to accumulate in the basement, that this was the cause of the fire, and that the valve was defective when it left the manufacturer.

More particularly, Professor Elden Stensaas, head of the Mechanical Engineering Department at the School of Mines and Technology testified that it was the grease used as a lubricant and sealant that had prevented the valve from closing properly. In his opinion this grease accumulated on the edge of the valve, became thick because of oxidation occurring while the valve was in the open position, and impeded the proper closing of the gas cock disc because of the increased viscosity. Professor Stensaas testified that he observed an accumulation of grease on the disc cock plate of the Honeywell valve and that this accumulation was hard or stiff to the touch.

Testimony also showed that the valve in question was manufactured in December 1968. It was established that Honeywell had recalled valves of that same family of valves (V8146) which were manufactured in July and August of 1968 because the gas cock assembly closed too slowly. The problem was attributed to the grease.[6] Although there is testimony that Honeywell then tightened its internal specifications, essentially the same grease was used in the valve in question.[7]

There was also evidence introduced which discounted the possibility of misuse of the product after it left the manufacturer. Based on the above we hold that the plaintiffs have established by a preponderance, the existence of a defect, which existed at the time it left the manufacturer, and which defect probably caused the fire. Examined in light of the clearly erroneous standard we can find no error in the trial court's determination of liability.

Honeywell next asserts that a number of evidentiary rulings made during the course of this rather lengthy trial were in error. It points to 46 assignments of error, any

---

**6.** It is important to note that Professor Stensaas reached his opinion independent of any knowledge of the Honeywell call-back. This is simply not the type of expert testimony discredited for lack of foundation in *Kleinsasser v. Gross*, 1964, 80 S.D. 631, 129 N.W.2d 717.

**7.** The trial court also permitted testimony of a grease change made in 1969, over Honeywell's objection. In addition, plaintiff was allowed to bring out subsequent teflon coating on both the gas cock disc and plate to facilitate closing. This was also done in 1969. While post-accident safety measures are properly excludable from a typical negligence case, *Morin v. Chicago and Northwestern Ry. System*, 1973, 87 S.D. 447, 209 N.W.2d 895, it was not error to admit such evidence in this instance. The policy behind exclusion is to avoid discouraging safety measures taken subsequent to an accident. A products liability case looks to a defect in the product rather than any culpable act by the manufacturer. In an age of mass production it is not reasonable to assume that manufacturers would forego improvements in a product and subject themselves to mass liability for a defect just because evidence of an improvement is admissible in a pre-improvement liability case. The pure economics of the situation dictate otherwise. *Ault v. International Harvester Co.*, 1975, 13 Cal.3d 113, 117 Cal.Rptr. 812, 528 P.2d 1148. This is especially true where the improvement is made prior to an accident but after a defective product has been marketed. *do Canto et al. v. Ametek, Inc.*, Mass., 1975, 328 N.E.2d 873.

one of which it maintains would require reversal. Honeywell does not point out in the brief or at argument how these rulings were in error. In fact, the assignments of error themselves state only that the various objections made should have been sustained. No authorities have been cited to assist this court.

The rulings of the trial court are presumptively correct; we have no duty to seek reasons to reverse. The party alleging error must show such error affirmatively by the record. *Custer County Board of Education v. State Commission on Elementary and Secondary Education*, 1972, 86 S.D. 215, 193 N.W.2d 586. Not only must error be demonstrated but it must also be shown to be prejudicial error. *Alberts v. Mutual Service Casualty Ins. Co.*, 1963, 80 S.D. 303, 123 N.W.2d 96. There is no affirmative showing of prejudicial error in this instance. An assignment of error not briefed or argued is deemed abandoned. *Schumacher v. R–B Freight Lines, Inc.*, 1950, 73 S.D. 535, 45 N.W.2d 458.

Honeywell's next attack is on the measure of damages awarded for the destruction of personal property. Its contention is that this award cannot exceed the fair market value of such property at the time it was destroyed. Honeywell contends that the market value of used personalty equals what such goods would bring at a distress sale. Mr. Shaffer testified as to value,[8] as did an insurance adjustor. They figured value for these goods by utilizing acquisition cost, when known, or replacement cost, adjusted by varying rates of depreciation (between 15% and 40%). The trial court adopted the latter method as the proper measure of damages. It was not error to do so.

There can be no doubt that second-hand market value is not adequate compensation for a person who suffers the destruction of his personal property.[9] Likewise, to permit full replacement value would be to allow more than the actual value of the goods destroyed. We find that the trial court reached a reasonable measure of damages in utilizing original cost or replacement cost adjusted by a percentage for depreciation varying with the age and condition of the property.[10] See *Marsh v. Union Pacific Ry. Co.*, C.C.Colo., 1882, 9 Fed. 873; *Rafal v. Rafal*, 1964, 41 Del.Ch. 434, 198 A.2d 177; *Gray v. Security Storage & Van Co.*, La.App., 1946, 26 So.2d 399.

Another hotly contested item of damage was the value assigned to the trophies and ribbons won at horse shows and destroyed by the fire. Trophies were valued at $15.00 each, ribbons at $3.50 each, and trophy buckles at $10.00 each. The trial court relied on the case of *Mosely v. Sears, Roebuck and Co.*, La.App., 1964, 167 So.2d 408, where the court held with reference to tennis trophies:

"It is obvious such articles were not for sale and do not have a market value, but in giving consideration to the 'blood, sweat and tears' which were expended to

8. South Dakota case law is clear that the owner of property is competent to testify as to its value. *Burke v. Thomas Chevrolet*, S.D., 1975, 227 N.W.2d 31; *Geo. A. Clark & Son, Inc. v. Nold*, 1971, 85 S.D. 468, 185 N.W.2d 677; *Hannahs v. Noah*, 1968, 83 S.D. 296, 158 N.W.2d 678.

9. See, e. g., *Featherston v. Hartford Fire Ins. Co.*, D.C.Ark., 1956, 146 F.Supp. 535; *Nelson v. Coleman Co.*, 1967, 249 S.C. 652, 155 S.E.2d 917; *Rafal v. Rafal*, 1964, 41 Del.Ch. 434, 198 A.2d 177; *Davis v. Rhodes*, 1925, 206 Ky. 340, 266 S.W. 1091; *Barker v. S. A. Lewis Storage & Transfer Co.*, 1905, 78 Conn. 198, 61 A. 363; Annot., 34 A.L.R.3d 816.

10. This court has recognized a similar measure of damages in different settings. See *Ward v. LaCreek Electric Ass'n*, 1968, 83 S.D. 584, 163 N.W.2d 344 (destruction of things attached to realty) (citing *Metropolitan Life Ins. Co. v. Farmers Co-op. Co.*, 68 S.D. 338, 2 N.W.2d 665); *Sheraton-Midcontinent Corp. v. County of Pennington*, 1959, 77 S.D. 554, 95 N.W.2d 892 (value of building for taxation); *Lampe Market Co. v. Alliance Ins. Co.*, 1946, 71 S.D. 120, 22 N.W.2d 427 (value of building in insurance case). We find no conflict between this measure of damages and SDCL 21–1–6 or 21–1–7.

obtain same, we feel Plaintiff is entitled to recover this nominal amount [$4.00 each]." 167 So.2d at 413.

It was not error to adopt this reasoning. We find no reason to disturb the trial court's determination of damages.[11]

 The final bone of contention between Honeywell and plaintiffs involves the trial court's grant of prejudgment interest. Interest was allowed from the date of the fire for personal property and from the termination of a reasonable restoration period for the house. The trial court relied on SDCL 21-1-11 in making that award;[12] that section is inapposite, however, because the claim involved is unliquidated. While the mere fact that the claim is disputed is not sufficient to deny interest, this court is hard pressed to agree that there were established or reasonably ascertainable market values for the items of damage involved here. Clearly more than mere arithmetic computation was required in this case. Cf. *Beka v. Lithium Corp. of America*, 1958, 77 S.D. 370, 92 N.W.2d 156; *Peter Kiewit Sons' Co. v. Summit Construction Co.*, 1969, 8 Cir., 422 F.2d 242.

 This does not mean that the interest award must fail. By statute interest in tort cases lies within the discretion of the trier of fact. SDCL 21-1-13 provides:

"In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury."

See *Uhe v. Chicago, M. & St. P. Ry. Co.*, 1893, 3 S.D. 563, 54 N.W. 601, affirmed on rehearing, 1894, 4 S.D. 505, 57 N.W. 484. We hold that based on this statute the award of interest was within the discretion of the trial court as trier of fact; we find

11. Honeywell contended that plaintiffs could not recover for the loss of their daughter's wedding gifts stored in their house and destroyed by the fire. We agree with the trial court's determination that the Shaffers are entitled to seek damages as bailees of those goods under SDCL 15-6-17(a).

12. SDCL 21-1-11 provides:

no abuse of discretion. See generally Annot., 36 A.L.R.2d 337.

The two companion appeals in this matter deal with the question of attorney's fees as a proper measure of recovery in an indemnity award. At the conclusion of the liability portion of the trial, the court entered Findings of Fact and Conclusions of Law granting Roberts-Gordon, A. J. Industries, and Dunkirk full indemnity against Honeywell, to include reasonable attorney's fees and costs of defense. Following the damage phase the trial court entered supplemental findings and conclusions which refused to grant attorney's fees and costs of defense as part of the indemnity award.

In reaching its decision the trial court relied on the general rule set out in *Tracy v. T & B Const. Co.*, 1970, 85 S.D. 337, 182 N.W.2d 320.

"Ordinarily, the terms 'cost' and 'expenses' as used in a statute are not understood to include attorney's fees and the court may allow attorney's fees as costs for or against any party to an action only in cases where specifically provided by statute. SDCL 15-17-7. At common law the right to recover attorney's fees from an opponent in litigation did not exist. In the absence of a statute or rule of court or some agreement expressly authorizing taxing of attorney's fees in addition to ordinary statutory costs, such an item of expense is not allowable. 20 Am. Jur.2d, Costs, § 72; *Dodds v. Bickle*, 77 S.D. 54, 85 N.W.2d 284." 182 N.W.2d at 322.

There is no South Dakota statute or court rule which would allow recovery of attorney's fees in this case; nor is there an express agreement to that effect. Roberts-Gordon, however, urges adoption of an exception to this general rule.

"Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor, from paying the debt."

This exception was considered by the Minnesota Supreme Court in *Sorenson v. Safety Flate, Inc.*, 1975, Minn., 235 N.W.2d 848, 851.

"' "If a party is obliged to defend against the act of another, against whom he has a remedy over, and defends solely and exclusively the act of such other party, and is compelled to defend no misfeasance of his own, he may notify such party of the pendency of the suit and may call upon him to defend it; if he fails to defend, then, if liable over, he is liable not only for the amount of damages recovered, but for all reasonable and necessary expenses incurred in such defense." Only in such case is there a right to recover such expenses.' "

However, even if this court were to adopt this exception, it would be of no avail to appellants. The record shows that although a tender of defense was made to Honeywell and a large part of the evidence went to the Honeywell product, appellants were also accused of separate wrongful acts.

"In cases where a party seeking indemnity has been required to defend claims arising out of another's wrongful conduct and also to defend accusations which encompass his separate wrongful acts, the court may properly disallow attorney's fees in indemnity action." *Farr v. Armstrong Rubber Co.*, 1970, 288 Minn. 83, 97, 179 N.W.2d 64, 72.

Because appellants were defending their own breach of warranty, disallowance of attorney's fees in this case is proper even under the exception to the general rule.

Appellant Dunkirk asserts that by granting attorney's fees in the first instance, the trial court established the "law of the case" which it could not later change. The "law of the case" doctrine is intended to afford a measure of finality to litigated issues. It is a rule of practice and procedure which for policy reasons provides that once an issue is litigated and decided it should remain settled for all subsequent stages of the litigation. See, e. g., *Topps-Toeller, Inc. v. City of Lansing*, 1973, 47 Mich.App. 720, 209 N.W.2d 843. We find

that this doctrine has no applicability in this case, however.

Dunkirk seeks to apply the rule to proceedings prior to entry of judgment. We decline to do so for two reasons. First, the purpose behind the doctrine is to avoid relitigation of issues in subsequent proceedings in the same case—remand, retrials, or appeals. It is the weaker corollary of the doctrines of res judicata, collateral estoppel and stare decisis and is intended to prove some degree of certainty where those doctrines could not yet apply. *Topps-Toeller*, supra. Its scope of application is reflected in the statement of the general rule:

"In the earlier decisions of this court it was well settled that a question decided on a former appeal became the law of the case, not to be questioned in a second or any subsequent appeal involving any branch of the case." *Gamble v. Keyes*, 1925, 49 S.D. 39, 43, 206 N.W. 477, 478.

Secondly, as a practical matter the application of the rule prior to entry of judgment would inhibit the trial court in correcting what it believed to be an erroneous decision. The rule of the "law of the case" should not be used to perpetuate an erroneous decision at this stage of the proceedings. We therefore conclude that the "law of the case" doctrine has no applicability to the entry of the supplemental findings and conclusions in the case at bar.

We find no error in the decisions of the trial court in this matter. The judgment entered is therefore affirmed.

All the Justices concur.