Wayne ROBBINS et al., Appellees,

v.

FARMERS UNION GRAIN TERMINAL
ASSOCIATION, Appellant.

No. 76–1413.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 14, 1977.

Decided March 17, 1977.

Rehearing Denied April 8, 1977.

A. Groseclose, Jr., Aberdeen, S. D., on the brief.

Ross H. Oviatt, Watertown, S. D., for appellees.

Before LAY and STEPHENSON, Circuit Judges, and WANGELIN,* District Judge.

LAY, Circuit Judge.

Farmers Union Grain Terminal Association (GTA) appeals from the award of $391,908.21 damages in favor of Wayne Robbins, Charles Robbins and James Robbins for the loss or damage to their cattle allegedly caused by a feed supplement, Rum-Liq, manufactured by GTA. The jury found the defendant liable under alternative theories of negligence, breach of implied warranty and strict liability.

On appeal the defendant has assigned numerous errors. We discuss as relevant to our holding: (1) whether there was sufficient evidence of negligence; (2) whether such negligence was the proximate cause of the plaintiffs' damage; (3) whether the trial judge properly admitted evidence of a remedial warning; and (4) whether the evidence supports the damages found by the jury. Finding no prejudicial error, we affirm the judgment of the district court.[1]

*Factual Background.*

The plaintiffs are partners in a cattle feeding operation near Watertown, South Dakota. In the fall of 1971 they purchased 3,259 calves with an average weight of 412 pounds. The calves were started on a feeding program which included Rum-Liq, a cattle feed protein supplement advertised as aiding in weight gain and being more economical than other protein sources. The main ingredient of Rum-Liq is urea, a widely used non-protein nitrogen substance which ruminant animals are able to convert into protein.

GTA's product bore a tag which stated:

C. Arlen Beam, Lincoln, Neb., for appellant; Larry L. Ruth, Lincoln, Neb., Chester

---

* H. Kenneth Wangelin, United States District Judge, Eastern and Western Districts of Missouri, sitting by designation.

1. Although numerous other errors were urged on appeal, we find that a discussion of them would be unproductive; we have reviewed each contention and find no prejudicial error.

WARNING—Follow directions on back of tag. . . .

The relevant part of the tag providing the feeding instructions read:

STARTING CATTLE ON FEED: Cattle coming into feedlot have normally been subjected to considerable stress—shipping, changes in feed, water and environment. Fresh, clean water and medium quality hay should be available in the feedlot when the cattle arrive. The first ten days follow the recommended programs using GTA ROUGHAGE ROUSER MEDICATED or GTA BEEF START MEDICATED. At the close of this period, change to a recommended GTA feedlot feeding program.

The plaintiffs started feeding each calf one-quarter pound of Rum-Liq daily. They gradually increased the dosage so that fourteen days after the calves arrived in the feed lot they were receiving one pound of Rum-Liq per day. After the fourteen-day "conditioning period," the calves were moved to outer pens where they continued to receive one pound of Rum-Liq each day. During the second week in November of 1971 some of the calves died and others were uncoordinated, bloated, urinating frequently, shaking and shivering, showing white foaming saliva, and breathing hard.

The Robbins first suspected that the calves were suffering from a respiratory disease, and they attempted treatment, but the calves did not respond. On December 8, 1971, after 77 animals had died and approximately 600 others were sick, two animals were taken to the diagnostic laboratory at South Dakota State University at Brookings. The lab found that blood of the two calves had a high level of ammonia, and they advised the plaintiffs, on the same day, that this could be the result of urea feeding. The plaintiffs immediately cleaned all the feed containing Rum-Liq out of the feed bunks, and stopped adding Rum-Liq to the feed. The sudden death losses decreased rapidly after December 9 and few animals subsequently developed the above described symptoms.

Beginning on March 7 the plaintiffs shipped their cattle for "finishing" to a commercial feed lot in Nebraska. According to plaintiffs' proof each of the seven shipments of cattle, when sold, weighed less on an average than normally expected and each shipment incurred extra feed and drug costs. An additional 59 head died at the commercial lot and 64 were sold early.

The plaintiffs sought the following damages: $2,000 for the Rum-Liq; $12,000 for extra veterinary expenses; $64,000 for the 342 dead animals (this figure took into account normal or expected deaths); $73,000 for extra feed; and $185,000 for losses on early sales and failure of the cattle to gain weight.

*Negligence.*

The thrust of plaintiffs' case is that GTA failed to give adequate warnings for the safe and effective use of its product.[2] Plaintiffs claim that GTA knew or should have known that, although their instructions recommended waiting 10 days before

---

2. Although addressing Iowa law, in *Buffington v. Amchem Products, Inc.*, 489 F.2d 1053 (8th Cir. 1974), we observed what are the general controlling principles under negligence regarding the duty to provide proper instruction in the use of a product. We said:

[A] manufacturer who undertakes to produce and sell to the general public a product whose use could possibly result in harm must provide sufficient instruction and give adequate warning. The instructions should give reasonable notice and *specific* direction as to proper use and all attendant risks which are foreseeable to a manufacturer who possesses superior knowledge so that the ordinary user may be fully informed.

*Id.* at 1055.

See also *Schenebeck v. Sterling Drug, Inc.*, 423 F.2d 919, 922 (8th Cir. 1970); *O'Hare v. Merck & Co.*, 381 F.2d 286, 291 (8th Cir. 1967); Noel, *Manufacturer's Negligence of Design or Directions for Use of a Product*, 42 Tenn.L.Rev. 11 (1974); Diller & Hart, *Product Liability: Directions for Use and the Duty to Warn*, 41 Va.L.Rev. 145 (1955); Comment, *The Manufacturer's Duty to Warn of Dangers Involved in Use of a Product*, 1967 Wash.U.L.Q. 206. The trial court, under South Dakota law, instructed the jury in a similar vein. See *Orrison v. City of Rapid City*, 76 S.D. 145, 74 N.W.2d 489 (1956).

starting calves on a full feeding program, experts recommended a longer delay.

■■■ Plaintiffs' animal nutrition experts testified that a manufacturer should warn a feeder to wait 28 to 30 days before starting calves on a high percentage urea feeding program such as Rum-Liq. Furthermore, Dr. Britzman, the Director of Animal Nutrition, Research and Management Services for GTA admitted that he knew of one authority who recommended that urea not be fed to calves within four weeks of weaning and that another authority questioned the feeding of urea to unadapted calves during early feed lot stages. From this evidence a jury could find that GTA's instructions inadequately warned of the danger of feeding urea to unadapted calves and that GTA had or through the exercise of reasonable care should have had knowledge of the dangers of urea.[3]

*Causation.*

The defendant claims that the plaintiffs failed to prove that Rum-Liq caused the death and sickness of plaintiffs' cattle. GTA points out that, if plaintiffs' experts are believed, the cause of the death and sickness was "ammonia toxicosis." Because other sources of protein produce ammonia when broken down in the same process as is urea, the defendant argues that plaintiffs have failed to connect the high level of ammonia in the blood supply to its product.

While there is dispute among the experts as to the cause of the death and sickness, three experts testified that they diagnosed the cause as high levels of ammonia in the blood stream with urea as the source— "urea toxicosis." Other evidence reveals that defendant's product was the source of urea. Thus there is evidence from which a jury could find that the cause of the deaths and sickness was ammonia toxicosis; that the source of the excess ammonia was urea; and that Rum-Liq was the urea source.

GTA further contends that the plaintiffs did not prove that the defendant's failure to adequately warn was the proximate cause of its damage since there was no evidence that plaintiffs would have heeded a different warning had one been given. The defendant contends that they rebutted the presumption that plaintiffs would have heeded different instructions,[4] by showing that the plaintiffs failed to follow the instructions that were given.[5]

At best, the instructions were ambiguous and the issue was properly presented to the jury. *Cf. Sterner v. U. S. Plywood-Champion Paper, Inc.,* 519 F.2d 1352 (8th Cir. 1975); *Buffington v. Amchem Products, Inc.,* 489 F.2d 1053 (8th Cir. 1974). The trial court instructed the jury that failure to follow the instructions would be contributory negligence and would bar recovery if it was the proximate cause of the deaths and sickness. We find no error here.

■■■ Our examination of the record demonstrates that plaintiffs made a submissible case of negligent failure to warn. Therefore, it is not necessary for us to discuss the

**3.** The defendant asserts that its warnings were adequate as a matter of law since the South Dakota Department of Agriculture (Department) registered Rum-Liq for distribution in South Dakota. *See McDaniel v. McNeil Laboratories, Inc.,* 196 Neb. 190, 241 N.W.2d 822, 828 (1976).

In *McDaniel* the court, while holding that an agency determination that a particular drug is *reasonably safe* should be given great weight, recognized that other courts placed less reliance on agency approval with respect to warnings. *See e. g., McEwen v. Ortho Pharm. Corp.,* 270 Or. 375, 528 P.2d 522 (1974); *Stevens v. Parke, Davis & Co.,* 9 Cal.3d 51, 107 Cal.Rptr. 45, 507 P.2d 653 (1973). These cases state that agency approval of warnings indi-

cates only that minimal standards have been met, and are not conclusive on whether the manufacturer's duty to warn has been fulfilled. In the instant case, while the Department registered the product there was no evidence that the Department ran tests on the safe use of Rum-Liq. Under the circumstances, we think the issue of whether the warnings were adequate was properly submitted to the jury.

**4.** *See Cunningham v. Charles Pfizer & Co., Inc.,* 532 P.2d 1377 (Okl.1975).

**5.** GTA interprets its feeding instructions as saying that Rum-Liq is not to be fed to cattle for the first 10 days. The plaintiffs interpreted the instructions as saying not to feed a *full* ration until 10 days has expired.

various issues GTA has raised concerning the applicability of implied warranty and strict liability.[6]

*Subsequent Remedial Warning.*

On December 31, 1971, GTA mailed the following notice to its sales personnel:

File copy distributed to all division personnel 1/12/72 SUPPLEMENTARY DIET FOR "NEWLY ARRIVED" FEEDLOT CATTLE

It is *not* recommended that high urea supplements (liquid or dry) be fed to cattle which have recently been placed in the feedlot. These cattle should be allowed time to overcome the stresses associated with shipment, vaccination, and adjustment to feedlot conditions. This may involve as long as 28–30 days. During this period, GTA ROUGHAGE ROUSER MEDICATED, or a similar low-urea supplement, should be fed.

Additional recommendation for handling and starting newly arrived feeder cattle are given on the attached sheets.

GTA FEEDS

Department of Animal Nutrition, Research and Management Services.

Plaintiffs offered this letter into evidence as relevant to the strict liability count to show an unreasonably dangerous and defective product. Plaintiffs also sought to show the feasibility of issuing such a warning in 1971 under their negligence theory. GTA objected that the exhibit was inadmissible on both counts under Fed.R.Evid. 407.[7] The trial court ruled that the letter was admissible as substantive evidence since Rule 407 did not apply to strict liability, but that it would not be admissible on the negligence count unless feasibility was "controverted" as required by Rule 407. Plaintiffs then requested GTA to admit feasibility, and when GTA refused the trial court ruled that plaintiff could show that it was feasible to give the remedial instruction prior to the plaintiffs' purchase of the feed supplement.

On appeal GTA asserts that the exhibit should have been excluded under Rule 407 on both the strict liability and negligence counts and urges that the feasibility of giving the precautionary measure was *not properly* controverted. In addition GTA claims that the trial court failed to give any limiting instruction as to the exhibit's admissibility, and that the plaintiffs improperly argued to the jury that the post-remedial measure was evidence of GTA's negligence.

We need not consider whether the issue of feasibility was properly controverted[8] because we find (1) that the exhibit was admissible under strict liability and (2) that GTA failed to object to plaintiffs' argument before the jury and did not request any cautionary instruction, or object to the court's failure to give a limiting instruction.

---

**6.** Specifically, defendant asserts that privity of contract was lacking under implied warranty and that under strict liability the defendant cannot be liable for property damage or economic loss. *But see Shaffer v. Honeywell, Inc.* 249 N.W.2d 251 (S.D.1976).

**7.** Fed.R.Evid. 407 provides:

When, after an event, measures are taken which if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

**8.** In view of the alternative holding that the exhibit was admissible under strict liability, we need not decide whether the feasibility to give the remedial warning in 1971 was properly controverted by GTA's refusal to admit the same. Seemingly, plaintiffs' request that the defendant admit feasibility, as interpreted by the court, placed the defendant between the rock and the hard place: GTA was either forced to openly admit the fact of feasibility to the jury or to allow the plaintiffs to prove the same. This offered the defendant little choice and it remains questionable that the issue can thus be "controverted" within the intent of Rule 407. *Cf.* 2 J. Weinstein & M. Berger, *Weinstein's Evidence,* ¶ 407[03] (1975).

*Rule 407.*

The trial court in receiving the exhibit relied on *Ault v. International Harvester Co.,* 13 Cal.3d 113, 117 Cal.Rptr. 812, 528 P.2d 1148 (1974). In the *Ault* decision the Supreme Court of California observed that the exclusionary rule governing subsequent remedial measures (Cal.Evid.Code § 1151) is applicable only to negligent or culpable conduct.[9] The court said that while the exclusionary rule "may fulfill this anti-deterrent function in the typical negligence action, the provision plays no comparable role in the products liability field."[10] 13 Cal.3d at 120, 117 Cal.Rptr. at 815, 528 P.2d at 1151.

▮ The Supreme Court of South Dakota has agreed with this rationale:

A products liability case looks to a defect in the product rather than any culpable act by the manufacturer. In an age of mass production it is not reasonable to assume that manufacturers would forego improvements in a product and subject themselves to mass liability for a defect just because evidence of an improvement is admissible in a pre-improvement liability case. The pure economics of the situation dictate otherwise.

*Shaffer v. Honeywell, Inc.,* 249 N.W.2d 251 at 257 n. 7 (S.D.1976).

We have applied the *Ault* rationale in allowing proof of post-occurrence design modification[11] and to a subsequent remedial instruction,[12] and find no reason to bar its applicability to Rule 407 since Rule 407 is, by its terms, confined to cases involving negligence or other culpable conduct. The doctrine of strict liability by its very nature, does not include these elements. *See Ault v. International Harvester Co., supra;* and *Passwaters v. General Motors Corp.,* 454 F.2d 1270, 1277–79 (8th Cir. 1972).

*Relevancy.*

▮ Relevancy of post-remedial measures in a defective design case have been outlined by the Seventh Circuit:

This view has been advanced by others. It has been pointed out that not only is the policy of encouraging repairs and improvements of doubtful validity in an action for strict liability since it is in the economic self interest of a manufacturer to improve and repair defective products, but that the application of the rule would be contrary to the public policy of encouraging the distributor of mass-produced goods to market safer products. (Note, Products Liability and Evidence of Subsequent Repairs, 1972 Duke L.J. 837, 845–852.)

The recent case of *Sutkowski v. Universal Marion Corporation* (1972), 5 Ill.App.3d 313, 281 N.E.2d 749, directly supports this conclusion. Noting that in the products liability field "policy considerations are involved which shift the emphasis from the *defendant manufacturer's conduct to the character of the product* " (emphasis added) (281 N.E.2d at p. 753), the *Sutkowski* court held that the Illinois statutory rule excluding evidence of post-occurrence changes in negligence cases did not apply to products liability cases. *Ault v. International Harvester Co.,* 13 Cal.3d 113, 121–22, 117 Cal.Rptr. 812, 815–16, 528 P.2d 1148, 1151–52 (1974) (footnote omitted).

**11.** *Hoppe v. Midwest Conveyor Co.,* 485 F.2d 1196 (8th Cir. 1973).

**12.** *Sterner v. U. S. Plywood-Champion Paper, Inc.,* 519 F.2d 1352 (8th Cir. 1975).

---

**9.** It is noteworthy that the Advisory Committee's Note to Fed.R.Evid. 407 specifically indicates that Rule 407 is patterned after § 1151 of the California Evidence Code. 2 J. Weinstein & M. Berger, *Weinstein's Evidence,* ¶ 407 (1975).

**10.** Justice Mosk writing for the Supreme Court of California offered the following cogent explanation:

When the context is transformed from a typical negligence setting to the modern products liability field, however, the "public policy" assumptions justifying this evidentiary rule are no longer valid. The contemporary corporate mass producer of goods, the normal products liability defendant, manufactures tens of thousands of units of goods; it is manifestly unrealistic to suggest that such a producer will forego making improvements in its product, and risk innumerable additional lawsuits and the attendant adverse effect upon its public image, simply because evidence of adoption of such improvement may be admitted in an action founded on strict liability for recovery on an injury that preceded the improvement. In the products liability area, the exclusionary rule of section 1151 does not affect the primary conduct of the mass producer of goods, but serves merely as a shield against potential liability. In short, the purpose of section 1151 is not applicable to a strict liability case and hence its exclusionary rule should not be gratuitously extended to that field.

[T]he plaintiff must establish that the "product in question has [not] lived up to the required standard of safety." [Citation omitted.] This, of course, requires proof that, *inter alia* : 1) the product as designed is incapable of preventing the injury complained of; 2) there existed an alternative design which would have prevented the injury; and 3) in terms of cost, practicality and technological possibility, the alternative design was feasible. Evidence of post-occurrence change which tended to satisfy plaintiff's burden on any of these issues would therefore, be relevant.

*Lolie v. Ohio Brass Co.*, 502 F.2d 741, 744 (7th Cir. 1974).

Under the view that "foreseeable danger" is still considered an element of strict liability,[13] evidence of "technological possibility," as related to the feasibility of a manufacturer to provide adequate instructions with its product, implies knowledge that such instructions could have been used to make the product safe or, at least, implies that such knowledge could be obtained through "the application of reasonably developed human skill and foresight." *See* Restatement (Second) of Torts § 402A, Comment j. In the instant case Dr. Britzman of GTA testified that it was "feasible" to give, in 1971, a warning similar to that contained in the exhibit.[14] Although the trial court limited the proof to show that it was feasible "to have sent out the notice," implicit in this admission is that it was technologically possible to have given the instructions in 1971. It would hardly be possible to concede feasibility to send out such cautionary instructions, if the manufacturer did not have either actual or constructive knowledge of the technological information. More relevant is the fact that a remedial instruction may provide substantial evidence that with a different instruction the harm would not have resulted (causation) and that failure to give the instruction created an unreasonably dangerous product (defect).[15] *Lolie v. Ohio Brass Co., supra.*

13. Although we express reservation in using negligence terms in a strict liability case (*see* n.15 *infra* ), the trial court instructed as follows:

In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use. Where, however, the product contains an ingredient whose danger is not generally known, or if known is one which the user would reasonably not expect to find in the product, the manufacturer is required to give warning against it, *if said manufacturer has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge,* of the presence of the ingredient and the danger. Failure to warn of such a danger renders such a product defective, but you are instructed, however, that the defendant is liable only if you find that such failure to warn is a proximate cause of the loss and injury to the plaintiffs' cattle.
(Emphasis added.)

14. The evidence also reveals that in the middle of December 1971 and at the end of February 1972 Dr. Bicknell told Dr. Britzman of GTA that GTA should explain to its customers that they should, during periods of stress, use caution in starting animals on Rum-Liq or in some instances advise them not to start animals on Rum-Liq. Dr. Britzman responded he could not do that because if he did people would not buy the product. He later changed his mind.

15. In product liability cases relating to the alleged failure of a manufacturer to give adequate instructions, the cases are confusing as to whether strict liability (defective product by reason of inadequate instructions) and negligence (failure to exercise reasonable care in instructing) theories of recovery require the same elements of proof as to known or foreseeable dangers. *Compare Phillips v. Kimwood Machine Co.*, 269 Or. 485, 525 P.2d 1033 (1974); and *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 337 A.2d 893 (1975); *with Karjala v. Johns-Manville Prods. Corp.*, 523 F.2d 155 (8th Cir. 1975); and *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1088 (5th Cir. 1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974).

Since knowledge and culpable fault are not elements in the proof of strict liability in product cases, it is somewhat anomalous to confuse negligence and strict liability by suggesting the same elements of proof. Conceptually, when dealing with a product made unreasonably dangerous by reason of inadequate instructions, to require proof that the manufacturer knew or should have known of the danger ("foreseeable dangers") is a misapplication of the principles underlying strict liability. As stated in *Dreisonstok v. Volkswagenwerk, A.G.*, 489 F.2d 1066 (4th Cir. 1974), discussing the second collision rule set forth in *Larsen v. General Motors Corp.*, 391 F.2d 495 (8th Cir. 1968):

The key phrase in the statement of the *Larsen* rule is "*unreasonable risk* of injury in the

■ We conclude that the directive was relevant and properly admitted under the strict liability count. The fact that the exhibit was generally admitted and should have been limited to the strict liability count does not require reversal. As we pointed out the defendant did not offer any limiting instruction or object to the failure of the trial court to give such an instruction. The purpose for requiring specific objection to instructions or to any alleged trial error is to provide the trial court the opportunity to correct the error at the time. *See, e. g., Sterling Drug, Inc. v. Cornish,* 370 F.2d 82 (8th Cir. 1966). This case is exemplary of the rule since it is clear that the trial judge fully intended to give a limiting instruction concerning Exhibit 38 but it was later inadvertently omitted. Under the circumstances the defendant cannot complain. *See Griggs v. Firestone Tire & Rubber Co.,* 513 F.2d 851 (8th Cir.), *cert. denied,* 423 U.S. 865, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975).

event of a collision", not foreseeability of collision. The *latter circumstance is assumed in collision cases under the Larsen principle*; it is the element of "unreasonable risk" that is uncertain in such cases and on which the determination of liability or no liability will rest.

489 F.2d at 1071 (emphasis added).

In recognizing this distinction in a product case involving a failure to adequately warn, the Supreme Court of Oregon perhaps says it best:

In a strict liability case we are talking about the condition (dangerousness) of an article which is sold without any warning, while in negligence we are talking about the reasonableness of the manufacturer's actions in selling the article without a warning. The article can have a degree of dangerousness because of a lack of warning which the law of strict liability will not tolerate even though the actions of the seller were entirely reasonable in selling the article without a warning considering what he knew or should have known at the time he sold it. A way to determine the dangerousness of the article, as distinguished from the seller's culpability, is to assume the seller knew of the product's propensity to injure as it did, and then to ask whether, with such knowledge, he would have been negligent in selling it without a warning.

It is apparent that the language being used in the discussion of the above problems is largely that which is also used in *negligence* cases, i. e., "unreasonably dangerous," "have reasonably anticipated," "reasonably prudent manufacturer," etc. It is necessary to remember that whether the doctrine of negligence, ultrahazardousness, or strict liability is being used to impose liability, the same process is going on in each instance, i. e., weighing the utility of the article against the risk of its use.

*Phillips v. Kimwood Machine Co.,* 269 Or. 485, 525 P.2d 1033, 1039 (1974).

Later in the same opinion the Oregon court referred to Professor Wade's article, *On the Nature of Strict Tort Liability for Products,* 44 Miss.L.J. 825, 830 (1973), and observed:

Professor Wade also suggests an appropriate jury instruction which embodies the new standard. We have taken the liberty of modifying his suggestion to a form which seems to us more appropriate for use by a jury. It is as follows:

"The law imputes to a manufacturer [supplier] knowledge of the harmful character of his product whether he actually knows of it or not. He is presumed to know of the harmful characteristics of that which he makes [supplies]. Therefore, a product is dangerously defective if it is so harmful to persons [or property] that a reasonable prudent manufacturer [supplier] with this knowledge would not have placed it on the market."

525 P.2d at 1040–41 n. 16.

*See also* Keeton, *Product Liability and the Meaning of Defect,* 5 St. Mary's L.J. 30 (1973); Keeton, *Products Liability—Inadequacy of Information,* 48 Tex.L.Rev. 398 (1970); Keeton, *Manufacturer's Liability: The Meaning of "Defect" in the Manufacture and Design of Products,* 20 Syracuse L.Rev. 559 (1969); Noel, *Products Defective Because of Inadequate Directions or Warnings,* 23 Sw.L.J. 256 (1969); and Wade, *Strict Tort Liability of Manufacturers,* 19 Sw.L.J. 5 (1965). *But see,* Kidwell, *The Duty to Warn: A Description of the Model of Decision,* 53 Tex.L.Rev. 1375, 1395–96 (1975).

The relevant issue concerning foreseeability in strict liability relates to intended use. We have previously acknowledged that "intended use" is merely a convenient adaptation of the test of foreseeability. *See Polk v. Ford Motor Co.,* 529 F.2d 259 (8th Cir.), *cert. denied,* 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976); and *Passwaters v. General Motors Corp.,* 454 F.2d 1270, 1275 (8th Cir. 1972). Under strict liability the knowledge of the danger is otherwise imputed to the defendant. Proof of a subsequent remedial modification, under these circumstances, therefore becomes relevant to show that a different design or instruction would have prevented the harm and that it was technologically feasible to provide a safer design or give a more adequate instruction before the product was marketed. *See Lolie v. Ohio Brass Co.,* 502 F.2d 741, 744 (7th Cir. 1974).

*Damages.*

The defendant challenges the amount of the verdict on three grounds: (1) there was insufficient evidence that all the death losses were caused by feeding Rum-Liq; (2) the trial court erroneously instructed the jury on the measure of damages for the cattle that did not die; and (3) the amounts awarded for the extra veterinary and feed costs were not reasonably incurred in mitigation of damages.

*Death Losses.*

The defendant urges that plaintiffs' cattle had other ailments which could have caused many of the deaths and that plaintiffs failed to prove that all their losses were attributable to Rum-Liq.

■ Although there was some evidence of other afflictions the trial court instructed the jury that the "mere fact alone" that the cattle developed certain symptoms or died was not proof that the cause was defendant's negligence and that the plaintiffs had the burden of proving "that such failure to warn was the proximate cause of said damages." The court specifically instructed the jury to consider that some cattle may have died in the normal course of operations.[16] We find that the trial court properly instructed the jury.

*Measure of Damages.*

The trial court gave the following instruction on the measure of damages for the cattle that survived:

Further, you are instructed that as to the cattle that lived, you may consider the difference between the market value that the cattle would have sold for if fully fed out but for the interference with their growth and the amount that

these cattle actually sold for. To this amount should be added veterinary expenses expended as a result of the interference and the cost of the feed required to finish feeding these cattle which was over and above that required in the normal course of feeding.

. . . . .

. . . The plaintiffs' measure of damages for their loss is the difference between what they could have obtained for their cattle on the date you find they should have sold them, in the condition they were then in, and what they would have brought at the same date and at the same place, if they had developed normally from the time that they took sick.

The defendant contends that the extra feed costs and failure to gain were not relevant measures of damage. The appropriate measure of damages for non-fatal injury to livestock, GTA contends, is the difference between the value just prior to and immediately after the injury plus the cost of treatment. *Overpeck v. City of Rapid City*, 14 S.D. 507, 85 N.W. 990 (1901) (damages for injury to a horse).[17] Under this standard, GTA argues, the diminution in value would be determined as of December 9, the date plaintiffs ceased using Rum-Liq as a feed supplement, and that no expenses incurred subsequently, except veterinary expenses, would be recoverable.

■ We find under South Dakota law that December 9 would not be the appropriate date for ascertaining the damages to plaintiffs' cattle, since the injury took place prior to maturation. Another South Dakota case, *Swenson v. Chevron Chemical Co.*, S.D., 234 N.W.2d 38 (1975), involving damage to a growing corn crop, is more analo-

---

16. The South Dakota Supreme Court, in *Shaffer v. Honeywell, Inc.*, 249 N.W.2d 251, Nos. 11635, 11637, 11643 (S.D., filed Dec. 31, 1976), recently observed:

> [T]he burden of proving causation also lies with the plaintiff. Causation may be established by circumstantial evidence where that evidence establishes by a preponderance, the probability that the accident was caused by a defect. [Citation omitted]. We do not re-

quire that plaintiff eliminate all other possible explanations of causation that the ingenuity of counsel might suggest. It is sufficient that plaintiff negate his own and others' misuse of the product. [Citation omitted].

*Id.* at 256 (footnote omitted).

17. The court awarded the owner of the horse the cost of treatment and the difference in value immediately before the injury and *after recovery.*

gous to the present case. There the court held that:

The method of ascertaining damages for crop injury, under the rule that the measure of damages is the difference between the value immediately before and immediately after the injury, *is to take the value at maturity which the probable crop would have had but for the injury [and] deduct the value which the injured crop actually had at maturity.*

. . . . .

234 N.W.2d at 43–44 (emphasis added). Thus we find that the trial court properly instructed the jury.

*Mitigation of Damages.*

 The defendant also contends that as a matter of law the extra feed costs were not recoverable. However, the plaintiffs had a duty to take reasonable efforts to mitigate damages. *See Overpeck v. City of Rapid City, supra.* Reasonable additional feeding of the cattle to produce weight gain and thus increase value, is recoverable as reasonable expenses in mitigation of damages. *See, e. g., Ruden v. Hansen*, 206 N.W.2d 713, 718 (Iowa 1973); and *W & W Livestock Enterprises, Inc. v. Dennler*, 179 N.W.2d 484, 486 (Iowa 1970).

 Finally the defendant contends that the damage awards for the extra veterinary expenses and feed costs were excessive. GTA claims these amounts were not *reasonable* expenses in mitigation of damages. The trial court instructed the jury that it was plaintiffs' duty to exercise reasonable diligence to mitigate damages. The court specifically instructed that plaintiffs were not entitled to continue to expend feed money and effort on "poor doing" or "sickly cattle." We find this issue was properly submitted.

Finding no error, we affirm the judgment of the district court.