282 So.2d 590 (1973)
Dorothy L. LANDRY and Roland Landry as administrator of the community of acquets and gains existing between himself and Dorothy L. Landry
v.
Harold J. ADAM et al., Consolidated with State Farm Mutual Automobile Insurance Company v. Harold J. Adam et al.
No. 5014.
Court of Appeal of Louisiana, Fourth Circuit.
August 21, 1973.
*592 McBride & Tonry, Richard A. Tonry, Chalmette, for plaintiffs-appellees.
Bernard, Micholet & Cassisa, Richard L. Bodet, Metairie, for defendants-appellants.
Skinner & Curry, William P. Curry, Jr., Metairie, for defendant-appellee.
Brierre & Malone, Eugene D. Brierre, New Orleans, for appellant.
Before LEMMON, STOULIG and BOUTALL, JJ.
LEMMON, Judge.
This is an appeal from a jury verdict and judgment awarding damages for injuries sustained by Mrs. Roland Landry in a three car accident. A judgment in favor of the Landrys' subrogated collision insurer in a consolidated case has also been appealed.
The accident occurred in midafternoon during rainy weather on the St. Bernard Highway just below Paris Road in Chalmette. At that point the highway consisted of two lanes, one for traffic in each direction, divided by a painted median line.
Although the testimony was somewhat confusing on these points, we find that the following sequence of events occurred: As Mrs. Landry slowed because of a slowdown in traffic, she was struck from the rear by a vehicle driven by Harold Adam. About ten to twelve seconds later and before Mrs. Landry and Adam could get out of their cars, a 1965 Pontiac driven by Garland Hilton struck the Adam vehicle from the rear and propelled it into the Landry vehicle for a second time.
Neither Adam nor Hilton were insured. When the Landrys sued these drivers, they also sued State Farm Mutual Automobile Insurance Company, their uninsured motorist carrier, as well as General Motors Corporation, the manufacturer of Hilton's Pontiac, alleging that Hilton's brake failure had been caused by a latent defect in the brake hose.
Answering special interrogatories, the jury exonerated Hilton, but found Adam and General Motors liable. The subsequent judgment was rendered in solido against Adam, General Motors and State Farm (to the limits of its uninsured motorist and medical payment coverage). Third party demands by State Farm, Hilton and General Motors were dismissed. State Farm and General Motors appealed suspensively.[1]
In the consolidated case State Farm sought recovery of the property damage payment made under Landry's collision coverage against Adam, Hilton and General Motors. The trial court rendered judgment against Adam and General Motors *593 and dismissed all incidental demands. General Motors appealed.
In this court General Motors first contests the jury verdict on liability by attacking the necessary factual findings as to the sequence of events. General Motors argues on this point that plaintiffs failed to prove Adam's vehicle struck Mrs. Landry again after being hit by Hilton or that Mrs. Landry was still in the car if such a collision did in fact occur.
Mrs. Landry testified that she had slowed for traffic and was driving 10 to 15 miles per hour when she was struck lightly from the rear; that while still in her car she sustained a second impact which was harder than the first; and that the two impacts were very close together. Upon cross examination she estimated about 12 seconds between impacts, and when Adam's counsel measured this amount of time on a watch, she identified that interval as approximately correct.
Adam testified that he was returning from work at an industrial plant located about one-half mile from the point of collision; that when he saw Mrs. Landry slowing, he applied his brakes, but hit the back of her car lightly; that as he was about to get out of his car, he sustained a "very hard impact"; and that he then struck Mrs. Landry's car again, this last impact causing his hood to bend. As to the time between impacts, he had in a deposition stated "instantly ... no more than five minutes." At trial he estimated various periods between one and five minutes, but admitted that when plaintiffs' counsel at the deposition had timed the period he identified as three minutes, the elapsed time on the watch was only ten seconds. As to whether or not Mrs. Landry was still in her car at the time his car struck her the second time, his testimony was again confusing at first, but was finally clarified to import that he saw her outside her car only after his second collision with her.
Hilton testified that when he saw Adam collide with Mrs. Landry, he applied his brakes, and that five to six seconds elapsed between the time he pressed his brakes and the time he hit the Adam vehicle. He did not know whether Adam then struck Mrs. Landry again or whether Mrs. Landry was still in her car at the time.
After considering the evidence outlined above, we find no manifest error in the jury's necessary conclusion that Mrs. Landry was struck a second time by the Adam vehicle after the latter was struck by Hilton and that she was in her car at the time of this collision.
General Motors next contends there was insufficient proof that Hilton's brakes failed or that the brake failure, if one occurred, either caused the accident or resulted from a latent defect for which the manufacturer was responsible. In this regard General Motors first argues that irrespective of any brake failure, Hilton caused his collision by speeding excessively, following too closely, and failing to keep a proper lookout and that perfect brakes could not have prevented the collision. As to this argument we perceive four factual possibilities: (1) Hilton was negligent as alleged and his brakes did not fail; (2) Hilton was negligent as alleged and his brakes also failed; (3) Hilton was not negligent, but he experienced brake failure; and (4) Hilton was not negligent and his brakes did not fail. By exonerating Hilton and finding General Motors liable, the jury necessarily found as a fact that the negligent acts or omissions by Hilton did not occur as alleged, but that his brakes failed.
Hilton, who also worked at the plant where Adam was employed, testified that he entered St. Bernard Highway from the plant and followed Adam thereafter; that he was driving about 30 miles per hour; that when he saw Adam collide with Mrs. Landry, he was 30 to 35 feet behind *594 Adam; and that he immediately applied his brakes, but that his car "continued to go."
General Motors correctly points out that if Hilton's estimate of distance between vehicles (35 feet) was correct, he would have traveled 33 feet (at 30 miles per hour or 44 feet per second) during the 3/4 of a second normal driver reaction time, before he could even apply his brakes. We note, however, that Hilton's estimate of distance between vehicles cannot be reconciled with his estimate of the interval (five to six seconds) between the time that he did apply his brakes and the time that he collided with Adam. If the time estimate was correct, he necessarily was substantially further behind Adam when he saw the first collision and not only had time to apply his brakes, but did so five to six seconds before he struck Adam. On the other hand, if the distance estimate was correct, he would have traveled the entire distance between the point of recognized danger and the point of impact in less than one second, and would not have had time to apply his brakes at all.
The trier of fact necessarily had to accept one estimate and disregard the other. Since Hilton's estimate of time between applying brakes and impact was relatively consistent with Mrs. Landry's and Adam's estimates of time between impacts, we cannot find that the jury erred in disregarding his inconsistent estimate of distance. The jury apparently determined that Hilton was traveling at a safe speed and a safe distance behind Adam so that he would have stopped in the six to twelve seconds between impacts, had his brakes functioned properly.
We therefore conclude that the jury did not commit manifest error in implicitly finding incidental to exonerating Hilton from liability that his driving conduct did not violate any statutes or any standards of reasonable care and that his brake failure caused the collision.
As to the brake failure, Hilton testified that he hit the brakes hard and at first thought the brakes grabbed, but that he did not feel his car slow down and that he continued to move into the rear of Adam's car. A friend, who worked part-time as an automobile mechanic, determined that the flexible hydraulic brake hose on the right front side had broken into two parts, about one inch from the metal fitting on the end of the hose. The broken area had jagged edges, and the hose itself had crumbled and appeared deteriorated. Since the other front hose had a similar appearance, he replaced both front hoses, whereupon the brakes worked perfectly.
Hilton had purchased the 1965 vehicle from a Pontiac dealer as a used car in 1966. When the accident occurred on February 14, 1969, the odometer registered approximately 54,000 miles.
Each year that he owned the car Hilton had the brakes inspected when he obtained the required inspection tag. Shortly after he bought the car, he had the brake shoes replaced, and about six months before the accident, he had the brake drum replaced upon the advice of the inspecting mechanic. Other than these normal items of maintenance, he had never experienced any difficulties with his brakes and had never changed the brake hoses.
An automotive mechanic, expert in the maintenance and repair of General Motors vehicles, particularly Pontiacs, testified that he had never encountered a broken brake hose in a wrecked automobile in his 24 years of experience; that jumping curbs, hitting loose objects on the road, or even wrecking the car should not affect the brake hose, unless the ball joint broke and the whole wheel fell; that when there is trouble with a brake hose, the first sign is seepage at either end; that one normally looks only for seepage when inspecting a brake hose; and that when a brake hose is completely broken, the fluid is ejected with one pump on the brakes, but if there *595 is only a hole or crack, it will take a number of times to pump the fluid out, depending on the size of the hole.
The expert testified further that about the time of the accident he had changed the brake hoses on numerous 1965 and 1966 Pontiacs. Although he did not find any completely broken, he did "find a lot of them so close it wasn't funny," and a number of hoses broke as they were being removed. He described the hoses as being in a deteriorated condition. However, he had never experienced this problem with either earlier or later model Pontiacs.
The mechanic owned a 1965 Pontiac and had changed the hose at 24,000 miles because he had noticed its "poor condition." When counsel for General Motors suggested that changing brake hoses at this mileage was part of periodic maintenance, the mechanic denied this and stated that hoses are changed only when visual inspection dictates the need. He further stated that the brake hose on Hilton's vehicle with 54,000 miles "should have been the original."
Accepting the testimony of Hilton and his friend who had changed the hoses that the right hose was found broken into two pieces after the accident, and considering the testimony of the expert mechanic, we conclude that the hose ruptured upon Hilton's heavy application of the brakes. Inasmuch as a hose does not ordinarily rupture in the absence of a defect and as other suggested explanations for the ruptured hose were excluded by the expert, we further conclude there was sufficient proof that the hose ruptured because of a defective condition.
General Motors contends, however, there was no proof that it manufactured the hose in question. Unfortunately, Hilton's friend did not anticipate litigation and discarded the hose at the store where he purchased the replacement part. Nevertheless, the fact that Hilton purchased the car the year after it was manufactured and never replaced the hose, combined with the testimony of the expert mechanic to the effect that a brake hose normally lasts the life of a car, reasonably leads us to conclude that the defective brake hose was part of the original equipment of the Pontiac.
Finally, General Motors urges a contention which cuts across the other liability issues in the case, namely, that the admission of a recall letter from General Motors had an inflammatory and prejudicial effect upon the jury. The form letter to owners of 1965 and 1966 Pontiacs read in part as follows:
"It has been determined that the flexible front brake hoses originally installed on your vehicle could, after extensive usage under certain driving conditions, fatigue. If this condition should exist on either hose, a sudden heavy brake application might cause the brake hose to rupture and result in loss of hydraulic braking action. However, the mechanical emergency braking system is not affected.
"To prevent the possibility of this occurring, please contact your nearest Pontiac dealer and make arrangements for replacement of the front flexible brake hoses. This service will be performed at no charge to you."
General Motors argues that evidence of remedies or precautions taken after an accident is not admissible to prove the existence of the defect at the time of the accident. This evidentiary rule is based primarily on relevancy, since subsequent repairs or precautions are not relevant to the determination of the existence of the defect at a prior time. Another reason for the exclusion of such evidence is a policy consideration that a person would be discouraged from repairing a defective condition after an accident if evidence of that repair could be construed against him as an indication of liability. See McCormick, Handbook of Law of Evidence Ch. 26, § 275, p. 666 (2nd ed. 1972); *596 II Wigmore, Evidence in Trials at Common Law, Ch. XII, § 283, p. 151 (3rd Ed. 1940); 64 A.L.R.2d 1296.
The policy against admitting such evidence also reflects the injustice of penalizing a prudent and well-meaning person who attempts to prevent the recurrence of an accident for which he was not originally responsible or who on the basis of past experience attempts to exercise a higher degree of care than the law requires. The conduct of a party must be judged according to the conditions and circumstances existing at the time of the occurrence and must be measured on the basis of standards applicable at that time.
We therefore agree that the safety campaign letter was not admissible to establish whether or not a defect existed in the brake hose on Hilton's Pontiac at the time of the accident. However, the condition of the hose at the time of the accident was not proved by the letter, but by the testimony of Hilton and his friend who changed the hose.
Nevertheless, the claimant in this type of products liability case must ultimately prove that his damages occurred because of a defect built into the automobile by the manufacturer. He must therefore prove that the defect existed not only at the time of the accident, but also at the time when the product left the hands of the manufacturer. See Prosser, Law of Torts, Ch. 17, pp. 671-2 (4th ed. 1971).
As to proof that the injury occurred because the product was defective at the time of the accident, the fact of a recall program is not relevant. The recall program at most indicates that some 1965 Pontiacs contained defective brake hoses, which proves nothing about the condition of Hilton's brake hose at the time of this accident. The danger in allowing the introduction of irrelevent evidence is that such evidence might be misconstrued as proof of some fact which the evidence does not in fact tend to prove. The letter cannot be used to make the transition from the general to the particular and to prove that this particular 1965 Pontiac contained a defective brake hose. The fact of a defective brake hose in this particular automobile at the time of this accident must be proved by direct evidence.
As to proof that the defect also existed when the vehicle left the hands of the manufacturer, other considerations arise, since in most cases that fact can be proved only by inference from circumstantial evidence. For example, if the consumer purchases a new automobile at the factory and the car in its first mile of use loses braking power because of a ruptured hose, a most convincing inference arises that the defect was built into the car during the manufacturing process. However, as the date of manufacture becomes more remote from the date of the accident, the inference becomes weaker and must be supported by other circumstantial evidence which negates intervening causation of the defect, such as proof that the brake hoses have never been changed, that the car has been properly and periodically maintained, that brake hoses normally last the life of a car, and that brake hoses do not normally rupture in the absence of a defect. This evidence does not directly prove that the particular brake hose was defective at the time of manufacture, but shows circumstances which tend to support such an inference. Along the same lines evidence that numerous other vehicles, produced at the same time by the same manufacturer, contained similar defects does not directly prove that the defect in this particular vehicle existed at the time of manufacture, but it does show circumstances which to some degree tends to support this inference. To that extent such evidence is relevant.
In the present case the expert supplied evidence that numerous other 1965 Pontiacs (including his own) contained similarly defective brake hose. This evidence was not objectionable, either on the *597 grounds of relevancy or of public policy. Similarly, the recall letter in our opinion was also unobjectionable on relevancy grounds. Public policy, however, would normally dictate the exclusion of such evidence, particularly since Federal law required that the letter be sent.[2] Yet once the expert stated the fact that numerous 1965 Pontiac contained defective hoses, the policy objection to the letter (which simply corroborated this fact) fell. Indeed, the letter in this case merely constituted superfluous evidence of this fact.
We therefore conclude the fact of a recall program cannot be used to prove that a defect existed in a particular vehicle at the time of a particular accident. However, once this defect is proved, then the fact that similar defects occurred in other vehicles made by the same manufacturer at approximately the same time is proper evidence to support the inference that this defect (proved by other evidence) existed when the automobile left the manufacturer's hands.[3] Nevertheless, for reasons of public policy, evidence of or reference to the recall program itself is an improper method of proving similar defects.
In the present case the letter was objectionable and should have been excluded. However, inasmuch as there was ample other evidence of similar defects in other 1965 Pontiacs, which is the only fact indicated by the letter, we hold that the introduction of the letter did not constitute reversible error.

STATE FARM'S THIRD PARTY DEMAND
State Farm contends that the trial judge erred in rejecting its third party demand against General Motors and Adam for indemnification. In order to determine the merits of this contention, we must first examine the basis of State Farm's liability on the main demand.
State Farm's liability to the Landrys was contractual in nature. In providing uninsured motorist coverage State Farm contracted:
"To pay all sums which the insured or his legal representative shall be legally entitled to recover as damages from the owner or operator of an uninsured automobile because of bodily injury, sickness or disease, including death resulting therefrom, hereinafter called `bodily injury,' sustained by the insured, caused by accident and arising out of the ownership, maintenance or use of such uninsured automobile; * * *"
This coverage further provided:
"(b) Any amount payable under the terms of this Part because of bodily injury sustained in an accident by a person who is an insured under this Part shall be reduced by
"(1) all sums paid on account of such bodily injury by or on behalf of (i) the owner or operator of the uninsured automobile and (ii) any other person or organization jointly or severally liable together with such owner or operator for such bodily injury * * *"
* * * * * *
"In the event of payment to any person under this Part:
"(a) the company shall be entitled to the extent of such payment to the proceeds of any settlement or judgment that may result from the exercise of any rights of recovery of such person against any person or organization legally responsible for the bodily injury *598 because of which such payment is made;"
The purpose of R.S. 22:1406 D(1) and the quoted policy provisions is to fully protect the insured, while limiting the ultimate liability of the insurer in case of payment to its insured by the uninsured motorist or by a party solidarily liable with an uninsured motorist.
Adam was the owner and operator of an uninsured automobile, from whom the Landrys were legally entitled to recover an amount of damages because of bodily injury arising out of the use of the uninsured automobile. General Motors was also liable with Adam for Mrs. Landry's bodily injury, its liability arising as manufacturer of a defective product which caused her injury. Nevertheless, the fact of General Motors' liability does not change the Landrys' right to a judgment against State Farm.
Since we conclude that State Farm is expressly liable under the policy to pay all sums its insured is legally entitled to recover from the uninsured motorist for bodily injury, we believe it is proper to affirm the judgment on the main demand against State Farm. We disagree, however, with the trial court's dismissal of State Farm's third party demand, since State Farm is entitled to the benefit of recovery against any other party liable on the main party demand. Accordingly, we reverse the judgment dismissing the third party demand and render judgment in favor of State Farm for any amount that this insurer is compelled to pay under the judgment on the main demand.

AMOUNT OF AWARD
Mrs. Landry consulted her family physician, who engaged in general practice, on the morning after the February 14, 1969 accident. His examination revealed tenderness, particularly in the low back area, and muscle spasm. Diagnosing acute lumbosacral strain and a lesser paravertebral muscle strain, he prescribed diathermy treatments and medication to ease the pain and relax the muscles. The tenderness and spasm continued through February and March, but by the end of April Mrs. Landry attained a full range of motion. In May the doctor recommended exercises to strengthen the muscles, and on May 19 she had a full range of motion and was free of spasm. However, when persistent pain and tenderness continued into June, the doctor recommended a support corset. During the next two months, she continued with medication, exercise and use of the brace. Although helped considerably by the back brace, her range of motion became limited because of pain and tenderness, and the doctor therefore administered in July and again in August a narcotic drug for relief of the pain. In September he prescribed a new muscle relaxant, as well as medicine to suppress her appetite, since he felt Mrs. Landry's obesity contributed to her prolonged suffering. In October the doctor again found spasm of the same muscles originally involved. Because of her persistent complaints, he repeated the x-ray examination. The treatment continued through March, 1970, although the doctor did not detect any further muscle spasm.
The doctor expressed his belief that Mrs. Landry's complaints were genuine. Because of her persistent symptoms over a prolonged period of time, he believed there was some injury to the ligaments surrounding the vertebra and to the muscles along the spinal column, and possibly some tearing of ligaments or muscles.
At the time of trial in July, 1970, Mrs. Landry testified that she had constant pain in the left side of her back, that she required medication in order to sleep, that she had been unable to do any heavy housework since the accident, and that she wore the brace daily and could hardly walk without it. Her husband and daughter (who performed the housework) completely corroborated her testimony.
*599 Two orthopedic specialists, who examined Mrs. Landry approximately one year after the accident, found no significant orthopedic problems, in that they detected no symptoms of nerve damage or of a herniated disc. One specifically recommended conservative treatment for the residual pain, consisting of weight reduction, support corset, exercise and muscle relaxing medication.
Medical expenses amounted to $426.00 in doctor bills, $22.63 for the brace, and at least $54.84 for drugs. No loss of wages were claimed. Adding $50.00 for the deductible portion of automobile damage not covered by collision insurance, we find the Landrys are entitled to $553.47 in special damages.
We view the jury award of $25,600.00 as excessive, inasmuch as there was no medical evidence that Mrs. Landry was permanently disabled or that her pain and suffering would continue for a considerable amount of time into the future. Nevertheless, the jury was apparently impressed with her statements that she had never suffered back pain prior to the accident and that, except during a period of subsidence of pain several months after the accident, she had thereafter suffered constantly. Inasmuch as the treating physician believed her complaints, continued to treat her, and at three separate times prescribed narcotic drugs for relief of pain, we cannot say that the jury manifestly erred in believing that Mrs. Landry endured substantial pain and suffering from her injuries. Her obesity probably contributed to the unusual amount and length of pain, and almost certainly prolonged her recuperative period, but since her obesity caused no back problems prior to the accident, this condition cannot serve to reduce the liability of the tortfeasors to respond in damages for their negligence.
We conclude that an award of $12,000.00, in addition to the special damages listed above, is justified by the evidence which was apparently accepted by the jury.

DECREE
The judgment of the trial court on the principal demand is amended to reduce the amount of the award to $12,553.47, plus interest and costs, and in all other respects is affirmed. The judgment dismissing the third party demand is reversed, and it is now ordered that judgment be rendered on the third party demand in favor of State Farm Mutual Automobile Insurance Company and against Harold J. Adam and General Motors Corporation in solido for any amount paid under the judgment on the principal demand, including costs of court.
Amended and affirmed in part, reversed and rendered in part.
NOTES
[1] General Motors' suspensive appeal bond was not timely filed, but did serve to perfect a devolutive appeal.
[2] See 15 U.S.C. § 1402.
[3] For general discussions as to this problem, see The Automobile Recall or "Campaign" Letter, Insurance Counsel Journal, Oct., 1971, p. 608; Products Liability and Evidence of Subsequent Repairs, 1972 Duke Law Journal 837; and The Defective Product and Strict Liability, A.B.A. Journal, Law Notes, April, 1969.