**Jean FARNER, as Administratrix of the Estate of John W. Farner, Deceased, Appellee,**

v.

**PACCAR, INC., Appellant.**

**No. 76–1992.**

United States Court of Appeals, Eighth Circuit.

Submitted April 14, 1977.

Decided Aug. 31, 1977.

David A. Gerdes, argued and made rebuttal, May, Adam, Gerdes & Thompson, Pierre, S. D., on briefs for appellant.

Charles Rick Johnson, Gregory, S. D., argued and filed brief for appellee.

Before HEANEY, ROSS and STEPHENSON, Circuit Judges.

HEANEY, Circuit Judge.

On March 14 or 15, 1971, John Farner and another truck driver left Huron, South Dakota, for Seattle, Washington, hauling a 40,000-pound load in a tractor trailer manufactured by Peterbilt Motors Company, a division of Paccar, Inc. While traveling west on Interstate 90 near Cle Elum, Washington, Farner's truck veered out of its lane and crashed into a concrete column between the east and westbound lanes at about 2:15 a. m. on March 17, 1971. Both men were killed instantly.

Jean Farner, the administratrix of the estate of her husband brought this wrongful death action against Paccar.[1] She alleged that Paccar's negligence in the design, testing and manufacture of the tractor's "air leaf" suspension system was a proximate cause of her husband's death. Liability was also alleged on the ground that Paccar failed to give the decedent timely warning as to the unsafe condition of the suspension system, and on the theory of strict liability. The jury found for the plaintiff on the issue of negligence and for Paccar on the issue of strict liability. Paccar appeals.[2]

I

Paccar contends that its motions for a directed verdict and for judgment notwithstanding the verdict or, alternatively, for a new trial should have been granted because the plaintiff failed to prove the existence of a defect in the Farner truck, or that any such defect was the proximate cause of the accident. We disagree.

The standards for granting a motion for a directed verdict and for judgment notwithstanding the verdict are the same. *Boyle v. Simon,* 558 F.2d 896 (8th Cir. 1977); *Compton v. United States,* 377 F.2d 408, 411 (8th Cir. 1967). In either procedural context, we apply the federal test for sufficiency of the evidence set out by this Court in *Polk v. Ford Motor Co.,* 529 F.2d 259, 267 (8th Cir.) (en banc), *cert. denied,* 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976), quoting *Hanson v. Ford Motor Co.,* 278 F.2d 586, 596 (8th Cir. 1960):[3]

> [I]n passing upon the motion for judgment, the trial court and this court are (1) to consider the evidence in the light most favorable to the plaintiffs as the parties prevailing with the jury; (2) to assume that all conflicts in the evidence were resolved by the jury in favor of the plaintiffs; (3) to assume as proved all facts which plaintiffs' evidence tends to prove; (4) to give the plaintiffs the benefit of all favorable inferences which may reasonably be drawn from the facts proved; and (5) to deny the motion if, reviewing the evidence in this light, reasonable men could differ as to the conclusions to be drawn from it.

Since such motions deprive the plaintiff of a determination of the facts by a jury, they should be sparingly granted. *Jeanes v. Milner,* 428 F.2d 598, 601 (8th Cir. 1970).

Under South Dakota law, the plaintiff must first prove that the product was defective and that the defect existed at the time that the product left the hands of the manufacturer before there can be recovery under a negligence theory of products liability. *Shaffer v. Honeywell, Inc.,* 249 N.W.2d 251, 256 (S.D.1976); *Engberg v. Ford Motor Company,* 87 S.D. 196, 201, 205 N.W.2d 104, 107 (1973). Paccar first contends that the existence of a defect must be established by direct evidence. This assertion is without merit. Under South Dakota law, as in other jurisdictions, proof of the existence of a defect may be made by direct or circumstantial evidence. *See, e. g., Shaffer v. Honeywell, Inc., supra* at 256; *Lindsay v. McDonnell Douglas Aircraft Corporation,* 460 F.2d 631, 638 n. 4 (8th Cir. 1972), and cases cited therein.

Paccar next contends that even if circumstantial evidence can support proof of a defect, there was insufficient circumstantial evidence here. Since Paccar does

---

1. This action was originally brought in state court and removed by Paccar to federal court pursuant to 28 U.S.C. § 1441. Federal jurisdiction is based on 28 U.S.C. § 1332.

2. Paccar does not argue the possible inconsistency of the jury's findings on appeal, nor did it raise the issue below and, thus, we do not address this issue here. *See Smith v. American Guild of Variety Artists,* 368 F.2d 511, 514 (8th Cir. 1966), *cert. denied,* 387 U.S. 931, 87 S.Ct. 2052, 18 L.Ed.2d 991 (1967); *cf. Pipefitters v. United States,* 407 U.S. 385, 442 n. 52, 92 S.Ct. 2247, 33 L.Ed.2d 11 (1972).

3. The standard is substantially the same under South Dakota law. *See Raebel v. Fishers Grove Golf Course, Inc.,* 214 N.W.2d 785, 786 (S.D.1974); *Leo v. Adams,* 87 S.D. 341, 346, 208 N.W.2d 706, 709 (1973); *Wilson v. Great Northern Railway Company,* 83 S.D. 207, 213, 157 N.W.2d 19, 22 (1968).

not dispute that the suspension system of the Farner truck was of the air leaf design, the only issue is whether that design was in fact defective. Under the air leaf system, both rear tandem axles of the truck tractor are connected on each side to leaf springs, which in turn are hooked at their front ends to the truck frame and at their back ends to rubber air bags which are attached to the truck frame. Since the springs are the only machine elements that keep the axles under the truck, they have to be highly reliable.

The plaintiff introduced testimony that more than fifty warranty claims for spring failure in air leaf trucks were received by Peterbilt during 1969 and 1970.[4] The receipt of these warranty claims led to a reassessment of the air leaf suspension system. In a series of three interoffice memoranda written in May and June, 1972, Donald L. Stephens, the Peterbilt engineer responsible for the design of the system, wrote that field observation and testing indicated that one brand of springs used "had extraordinary failure rates," as well as "substantial surface decarburization." The axle clamps were described as "grossly inadequate" or of "marginal design," with the result that springs could slip from their clamped position and affect load distribution among the springs. He also stated that all trucks, with the exception of some delivered to Eugene, Oregon, had not been adjusted to balance the load among the springs, with the attendant danger that "[a] misadjusted spring set [could] have [a] disasterously high preload on one spring." He noted that because of these problems, a

campaign was underway to recall air leaf suspension trucks in order that some springs, axle clamps and U-bolts could be replaced; that the balance of the springs could be adjusted; and that the dual air valves previously used could be changed to single valves to decrease spring stress. A recall letter was received by the plaintiff sixteen months after the accident.[5]

The plaintiff also introduced the testimony of several local truckers who had experienced spring failure. Dennis Kauer testified that in May, 1973, when he was driving a Peterbilt truck identical to the Farner vehicle and with a similar load, the right-hand spring connecting the forward rear tandem axle to the tractor frame broke. Kauer testified that the truck veered first toward the shoulder and then toward the center line. The breakage of the spring caused the axle to become freewheeling; and after the truck stopped, he noticed that the tires of the forward dual axle on the broken side had moved back until they were rubbing against the tires of the rear tandem axle. He further testified that after the spring broke, he noticed that two of the spring's three leaves had rusted cracks more than halfway to the center of the leaves. Richard Curtis testified to a similar spring failure and loss of vehicle control when driving a 1972 Peterbilt truck equipped with an air leaf suspension system. He testified that after the broken spring was replaced, his trucking firm installed chains around the axles of their Peterbilt trucks to hold the axle in place in the event of spring failure. His father, Robert

---

4. During this period, approximately 5,000 air leaf suspension trucks were built by Peterbilt.

5. This letter, addressed to John Farner, stated:
 This letter is sent to you pursuant to the requirement of the National Traffic and Motor Vehicle Safety Act.
 The rear suspension of your Peterbilt truck/tractor * * * may contain a potentially hazardous condition.
 We have discovered that the combination of spring misalignment, improper maintenance and air pressure imbalance can cause overstressing of one spring resulting in a premature spring failure that can seriously affect vehicle control.

You should make a simple visual inspection at once and have broken springs replaced immediately (at no charge).
 Regardless of the condition of these springs, federal law requires that an authorized Peterbilt distributor perform certain adjustments and modifications to prevent the development of a hazardous condition.
 * * * * * *
 We apologize for the inconvenience this will cause you, but the seriousness of this situation cannot be overstated. We urge you to contact any authorized Peterbilt distributor, and make your vehicle available for this rework at the earliest possible time.

Curtis, testified that several springs broke on his Peterbilt trucks prior to the installation of the safety chains, and that subsequent to this modification, another spring broke and the axle was held by the safety chain.

Farner purchased the truck in question as a new vehicle in March, 1970, from Sioux City Truck Sales in Sioux City, Iowa. Although the normal life of springs of the type on the Farner truck is five to six years, two springs broke during its first year of operation. At the time of the accident, the truck had been driven approximately 190,000 miles; thus, it was considered practically new by industry standards. There was evidence that Farner had many years of experience in the trucking business and carefully maintained his equipment. The wreck was not inspected for suspension system failure after the accident.[6]

The only evidence introduced by Paccar which tended to directly negate the existence of a design defect was the testimony of a Peterbilt engineer that failure of air leaf suspension springs could be caused by operation on a rough road at high speeds, an overloaded condition or inadequate maintenance and alignment. We believe that the evidence, taken as a whole, sufficiently supports the inference that a design defect existed in the Farner truck and that this defect existed at the time that it left the hands of the manufacturer.[7]

Paccar next contends that even if a defect in the truck was identified, there was insufficient evidence that this defect proximately caused the accident. It argues that since the accident could have resulted from other causes, such as sleep or inattention by the driver, a verdict in its favor should have been directed.

■■■ Viewing the evidence in the light most favorable to the plaintiff and assuming that all conflicts in the evidence were resolved by the jury in the plaintiff's favor, we conclude that there was sufficient evidence from which the jury could have found that failure of the truck's spring suspension system was a proximate cause of the accident. There was testimony at trial that the tires on the tandem axles of the truck, as shown in a photograph taken after the accident, appeared to be touching and that this could have been due to spring failure.[8] The operator of the wrecker, who towed the truck from the scene, testified that the wreck was tracking off to one side, which could have been due to the wheels being out of alignment or the frame being bent. The cargo of the truck was thrown to the left upon impact, from which the jury could reasonably infer that the wheels were out of alignment. Paccar's theory that sleep caused the accident was based primarily on the opinion of two patrolmen who testified that the truck's tracks gradually veered from their lane of travel with no evidence of evasive steering or braking except for

6. Following the accident, the wreck was hauled into a salvage yard in Cle Elum, Washington. After about thirty days, it was cut into pieces and hauled away. None of the pieces was recovered.

7. *United States Rubber Company v. Bauer*, 319 F.2d 463 (8th Cir. 1963), cited by Paccar, is readily distinguishable. In that case, there was no evidence that the breakage of the combine belt was due to a design defect. Although there was testimony of frequent belt failure, there was also testimony that the normal life for a belt of that type could be as short as one hour. The fact that the manufacturer agreed to accept the return of the belts was also of little probative value since, in the absence of explanation, that action could be "just as consistent with a genuine concern * * * that any injury had resulted with one of its belts, with a

cautious desire to ascertain *if there was a defect*, and with a willingness to cooperate * * * with its established customers." *Id.* at 468 (emphasis added). In the instant case, the Stephens' memoranda indicate that Peterbilt had determined that design changes were required in the air leaf suspension system prior to the truck recall.

8. Normal spacing between the forward and rear tires on the tandem axles of a truck such as Farner's would, depending on tire size, be about ten inches. A witness for Paccar testified that, in his view, the axles of the Farner truck, as shown in the post-accident photograph, did not appear to be out of alignment. Both patrolmen, who were at the accident scene, testified that they did not recall the wheels of the truck being out of alignment.

short skid marks which were attributed to the shortening of the truck upon impact. However, the patrolmen conceded that the driver would have had only one and a half to two seconds to have reacted since it was agreed that the truck was traveling between fifty and sixty miles per hour and that it left its lane of travel only 130 to 200 feet prior to impact. Paccar's theory that sleep caused the accident must also be evaluated against the evidence that Farner and his driver stopped for coffee at a cafe about twenty-six miles east of the accident site; that six miles east of the scene, the driver of the Farner truck appeared to be alert by responding to the signal of another trucker; and that, according to the plaintiff's witnesses, the driver would have been forced to slow down to thirty to forty miles an hour in order to negotiate a curve a mile east of the accident and then shift gears four or five times to achieve the speed at which the truck was moving at the time of impact.[9] Paccar's alternate theory of causation, that inattention of the driver caused the crash, was supported only by the evidence that the truck was equipped with a tape deck. Although the evidence as to causation was purely circumstantial, that alone does not defeat the plaintiff's case.[10] *See Shaffer v. Honeywell, Inc., supra* at 256; *Engberg v.*

*Ford Motor Company, supra* 87 S.D. at 202, 205 N.W.2d at 107.

We conclude that there was sufficient evidence to support the jury's verdict. Paccar's motions for a directed verdict and for judgment notwithstanding the verdict were properly denied.[11]

## II

Paccar contends that the trial court erred in admitting into evidence the Stephens' memoranda and the recall letter mailed to John Farner. It contends that there was insufficient foundation for their admission, that the documents were hearsay and that any probative value which they had was outweighed by their prejudicial effect.

The admission or exclusion of evidence necessarily lies within the sound discretion of the trial court. *Bond v. Local Un. 823, Int. Br. of T., C., W. & H. of America,* 521 F.2d 5, 10 (8th Cir. 1975); *Lowry v. Black Hills Agency, Inc.,* 509 F.2d 1311, 1313–1314 (8th Cir. 1975). We find no abuse of discretion here.

At the time of the admission of the Stephens' memoranda, the plaintiff had established that the Farner truck was equipped

---

9. Paccar countered the plaintiff's witnesses with the testimony of an investigating patrolman that although the curve was posted at thirty-five miles per hour, he observed truck traffic negotiating the curve at fifty- to fifty-five miles per hour.

10. Paccar, citing *Parham v. Dell Rapids Township,* 80 S.D. 281, 122 N.W.2d 548 (1963), argues that where there are several equally probable causes for an accident, the plaintiff has failed to make a submissible case. Although *Parham* seems to support this proposition, it would appear to conflict with the well established South Dakota rule that questions of proximate cause are to be taken from the jury only when the facts are such that reasonable men could not differ as to the conclusion to be drawn therefrom. *See Raebel v. Fishers Grove Golf Course, Inc., supra* at 786; *Leo v. Adams,* 87 S.D. 341, 346, 208 N.W.2d 706, 709 (1973); *Wilson v. Great Northern Railway Company, supra* at 22. If two or more inferences as to causation appear to the court to be equally probable, that fact alone strongly indicates that reasonable men might differ as to the conclusion to be drawn. *See Wratchford v. S. J.*

*Groves & Sons Company,* 405 F.2d 1061, 1067 (4th Cir. 1969); 9 C. Wright and A. Miller, Federal Practice and Procedure § 2528 at 567–568 (1971). In any event, Paccar's motions were properly denied. Under *Parham* and its progeny, a plaintiff need not eliminate all other possible explanations of causation but only prove, by a mere preponderance of the evidence, that her theory of causation is correct. *See Shaffer v. Honeywell, Inc.,* 249 N.W.2d 251, 256 (S.D.1976); *Engberg v. Ford Motor Company,* 87 S.D. 196, 202, 205 N.W.2d 104, 107 (1973); *Parham v. Dell Rapids Township, supra* 80 S.D. at 287, 122 N.W.2d at 552. That burden of proof has been met here.

11. We also reject Paccar's alternate contention that its motion for a new trial should have been granted. The jury's verdict was not, in our view, against the great weight of the evidence. *See Vickers v. Gifford-Hill & Co., Inc.,* 534 F.2d 1311, 1315 n. 7 (8th Cir. 1976); *Reed Brothers, Inc. v. Monsanto Company,* 525 F.2d 486, 500 (8th Cir. 1975), *cert. denied,* 423 U.S. 1055, 96 S.Ct. 787, 46 L.Ed.2d 645 (1976).

with an air leaf suspension system; and that prior to the fatal crash, two of its springs had broken. There was also the testimony of two local truckers that while driving Peterbilt trucks similar to the Farner truck, they experienced spring failure and loss of vehicle control. More than fifty warranty claims received by Peterbilt during 1969 and 1970 for spring breakage in air leaf suspension trucks were introduced. These facts clearly provided sufficient foundation for the admission of the Stephens' memoranda in which Peterbilt's chief engineer in charge of the development of the air leaf suspension system discussed tests of the springs conducted by Peterbilt and possible causes for their "extraordinary failure rates."

 We also find that the same facts, together with the Stephens' memoranda, were sufficient foundation for the admission of the recall letter. Paccar argues that it should have been excluded because the sole purpose of the recall campaign was to change all double valves used in the air leaf system to single valves and that this change was unrelated to the plaintiff's claim of defective springs. This argument is without merit. It is evident from the Stephens' memoranda and the deposition of Laverne Eilers, service manager for Sioux City Truck Sales, that the recall campaign was initiated not only for valve replacement but also for replacement of any defective springs, clamps or U-bolts and for the balancing of the springs. This multiple purpose is reflected in the recall letter where it was stated that a "combination of spring misalignment, improper maintenance and air pressure imbalance can cause * * * premature spring failure." The recall campaign was, therefore, directly related to the plaintiff's prior evidence of spring failure since the theory of her case was not limited to a claim of defective springs per se but was rather that a defectively designed system, including air pressure imbalance caused by improper valves, was the cause of spring failure.

We turn now to Paccar's contention that the Stephens' memoranda and the recall letter should have been excluded because of the hearsay rule.[12] Ordinarily these documents would be admissions falling outside of the hearsay rule as prior statements by a party opponent or its employee offered against that party at trial.[13] However, Paccar contends that these documents should not be considered admissions since the recall campaign, with which they were concerned, was initiated under the compulsion of the National Traffic and Motor Vehicle Safety Act.[14]

 Although the principles governing admissions by a party-opponent do not exclude admissions made under a duty imposed by law, such admissions may, nonetheless, be excluded where the statute imposing the duty expressly makes the communication confidential or where such privilege is necessarily implied in order to further public policy objectives. *See* 4 Wigmore, Evidence § 1050 (Chadbourn rev. 1972). The National Traffic and Motor Vehicle Safety Act imposes no express confidentiality upon recall communications between manufacturers and purchasers.[15]

---

12. *See* Fed.R.Evid. 801 *et seq.*

13. Fed.R.Evid. 801(d) provides:
 (d) *Statements which are not hearsay.* A statement is not hearsay if—
 * * * * * *
 (2) *Admission by party-opponent.* The statement is offered against a party and is (A) his own statement, in either his individual or a representative capacity, or (B) a statement of which he has manifested his adoption or belief in its truth, or (C) a statement by a person authorized by him to make a statement concerning the subject, or (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship, or (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.

14. Pub.L. 89–563, Title I, § 113, 80 Stat. 725 (1966); Pub.L. 91–265, § 4(a)–(c), 84 Stat. 262 (1970) (current version at 15 U.S.C. § 1411 *et seq.*).

15. The Act does contain provisions governing the confidentiality of information obtained by the Secretary of Commerce in the course of enforcement or reporting procedures under the Act. *See* 15 U.S.C. §§ 1401(e), 1418(a)(2).

Paccar argues, however, that such a privilege should be implied since the admission of recall evidence might deter manufacturers from disclosing potential safety hazards which they discover. *See Vockie v. General Motors Corporation, Chevrolet Div.*, 66 F.R.D. 57, 61 (E.D.Pa.), *aff'd*, 523 F.2d 1052 (3rd Cir. 1975).

We decline to follow the *Vockie* case. In *Robbins v. Farmers Union Grain Terminal Ass'n*, 552 F.2d 788 (8th Cir. 1977), this Court held that the exclusionary rule governing subsequent remedial measures is inapplicable in a strict liability case because it serves no deterrent function. The reason for this conclusion is expressed by the South Dakota Supreme Court:

A products liability case looks to a defect in the product rather than any culpable act by the manufacturer. In an age of mass production it is not reasonable to assume that manufacturers would forego improvements in a product and subject themselves to mass liability for a defect just because evidence of an improvement is admissible in a pre-improvement liability case. The pure economics of the situation dictate otherwise.

*Shaffer v. Honeywell, Inc., supra* at 257 n.7, quoted in *Robbins v. Farmers Union Grain Terminal Ass'n, supra* at 793.

We believe that this reasoning is equally applicable here. Just as it is not reasonable to assume that manufacturers will forego improvements in products in order to avoid admission of the evidence of the improvements against them, it is not reasonable to assume that the manufacturers will risk wholesale violation of the National Traffic and Motor Vehicle Safety Act [16] and liability for subsequent injuries caused by defects known by them to exist in order to avoid the possible use of recall evidence as an admission against them. We find no error in the admission of these documents on this ground.[17]

Lastly, Paccar contends that the Stephens' memoranda and the recall letter should have been excluded because of the inherently prejudicial nature of the recall evidence. Although there is always some attendant danger in the admission of recall evidence, we do not believe that, under the circumstances of its admission in this case, that danger of prejudice outweighed its probative value. *See* Fed.R.Evid. 403; *Lowry v. Black Hills Agency, Inc., supra* at 1314. The Stephens' memoranda and the recall letter were probative both of the existence of a design defect in the Farner vehicle [18] and of the negligent failure to warn of known dangers. *See McGrath v. Wallace Murray Corporation*, 496 F.2d 299, 304 (10th Cir. 1974). Since there was independent evidence of spring failure in both the Farner truck and other trucks equipped with the air leaf suspension system prior to the introduction of these documents, the danger of prejudice was reduced. *See Fields v. Volkswagen of America, Inc.*, 555 P.2d 48, 58 (Okl.1976). *Cf. Landry v. Adam*, 282 So.2d 590, 597 (La.App.1973). Moreover, any possible prejudice to Paccar resulting from the introduction of these docu-

**16.** Under 15 U.S.C. § 1398(a), violators of the National Traffic and Motor Vehicle Safety Act are subject to a civil penalty of up to $1,000 for each violation with respect to each motor vehicle in issue, not to exceed $800,000, for any related series of violations.

**17.** Nor were these documents inadmissible by reason of Fed.R.Evid. 407, since this rule does not bar admissibility under the strict liability count, *see Robbins v. Farmers Union Grain Terminal Ass'n*, 552 F.2d 788, 792–793 (8th Cir. 1977), and no request for a limiting instruction was made. *See* Part III, *infra.*

**18.** *Cf. Kane v. Ford Motor Company*, 450 F.2d 315 (3rd Cir. 1971), where the defect, which was the subject of the recall campaign, existed in only some of the vehicles recalled and there was no evidence that the condition described in the recall letter existed on the subject vehicle. In the instant case, there is no dispute that the Farner truck was equipped with an air leaf suspension system and that certain modifications to be made under the campaign, such as the change from a double to a single air valve, affected the Farner truck. In addition, the fact that two springs broke on the truck during its first year of operation, despite the fact that such springs have a useful life of five to six years, was probative of the conclusion that the design defect had created a dangerous condition in the Farner truck.

ments was lessened by the fact that the recall campaign was already before the jury as the result of the introduction of the Eilers' deposition, which Paccar does not challenge on appeal. The weighing of the probative value of evidence against its possible prejudicial effect is committed to the discretion of the trial court. *Lowry v. Black Hills Agency, Inc., supra* at 1314. We find no abuse of discretion here.[19]

### III

Lastly, Paccar contends that the testimony of Richard and Robert Curtis as to the installation of safety chains around the axles of their Peterbilt tractors should have been excluded. It contends that the admission of this evidence violated the prohibition of Fed.R.Evid. 407 against the admission of evidence of subsequent remedial measures, and that evidence of spring failure and subsequent installation of safety chains on the Curtis' trucks was not relevant to the issue of the existence of a defect in the Farner truck's suspension system.

■■■ The admission of the evidence of the Curtis firm's modifications was not barred by Fed.R.Evid. 407. Since Rule 407 does not apply to actions based on strict liability, this evidence was admissible under the strict liability count. *Robbins v. Farmers Union Grain Terminal Ass'n, supra* at 792–793. The fact that this evidence was generally admitted does not change this result since Paccar failed to request any

limiting instruction or object to the failure of the trial court to so instruct the jury. *See Robbins v. Farmers Union Grain Terminal Ass'n, supra* at 795; *Griggs v. Firestone Tire and Rubber Company,* 513 F.2d 851, 857 (8th Cir.), *cert. denied,* 423 U.S. 865, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975).[20]

■■■ We also conclude that the evidence of spring failure in the Curtis firm's Peterbilt trucks, and the firm's subsequent installation of safety chains, was relevant to the issue of defective design. *See Hoppe v. Midwest Conveyor Company, Inc.,* 485 F.2d 1196, 1202 (8th Cir. 1973). From the existence of spring breakage in similar Peterbilt air leaf suspension systems and the need for a safety device to hold the axles in place, the jury could infer that the same potential malfunction existed in the Farner truck and that this malfunction resulted in loss of vehicle control. *See Cunningham v. Gans,* 507 F.2d 496, 500 (2nd Cir. 1974); *Carlson v. Chisholm-Moore Hoist Corporation,* 281 F.2d 766, 772 (2nd Cir.), *cert. denied,* 364 U.S. 883, 81 S.Ct. 172, 5 L.Ed.2d 104 (1960). This evidence tends to make the desired inference more probable than it would be without it, *see* Fed.R.Evid. 401, and its admission was not an abuse of discretion.

■■■ Paccar also argues that there was insufficient foundation to permit Robert Curtis to give his opinion "on the proper design of suspension systems for trucks." This argument is without merit. The quali-

---

**19.** Paccar also argues that if the recall evidence should have been excluded, then the instructions of the trial court submitting the issue of negligence to the jury should not have been given. Since we find that the recall evidence was properly admitted, we do not reach this claim.

**20.** We also note that the rule against the admission of subsequent remedial measures in negligence cases may not apply in any event since the corrective measures were not carried out by the defendant. In such a case, the policy consideration behind the rule of encouraging the defendant to remedy a dangerous condition without fear that the remedial measure will later be used as an admission of fault against him is not applicable. *See Lolie v. Ohio Brass Company,* 502 F.2d 741, 744 (7th Cir. 1974); *Wallner v. Kitchens of Sara Lee, Inc.,*

419 F.2d 1028, 1032 (7th Cir. 1969); *Louisville & Nashville Railroad Company v. Williams,* 370 F.2d 839, 843–844 (5th Cir. 1966). The other reason traditionally given for the exclusion of this evidence is that it is not relevant since it is equally consistent with injury by mere accident or through contributory negligence of the plaintiff as it is with injury through the negligence of the defendant. Although this ground for exclusion may still have some force where corrective measures are taken by someone other than the defendant, *see Louisville & Nashville Railroad Company v. Williams, supra* at 844, under the more liberal theory of relevance embodied in the Federal Rules of Evidence, this ground alone would probably not support exclusion since the inference of prior negligence is still a possible one. *See* Advisory Committee's Note to Fed.R.Evid. 407.

fication of experts and the admission of opinion testimony lies within the sound discretion of the trial court. *Polk v. Ford Motor Co., supra* at 271; *Lakota Girl Scout Council, Inc. v. Havey Fund—Rais. Man., Inc.,* 519 F.2d 634, 642 (8th Cir. 1975). We agree with the trial court that Curtis, who had been in the trucking business almost thirty years and who, at the time of trial, controlled twelve tractors, five of them Peterbilt tractors with air leaf suspension systems, could testify as to the simple use of the safety chains either as a lay witness speaking within his own knowledge and perception, *see* Fed.R.Evid. 701, or as an expert qualified by knowledge, experience or skill. *See* Fed.R.Evid. 702; *Moran v. Ford Motor Company,* 476 F.2d 289, 291 (8th Cir. 1973).

The judgment is affirmed.