**Lillian B. VARGA, Plaintiff,**

v.

**Dean E. WOODS, Glenda R. Woods, and David O'Neill, Defendants and Appellees,**

and

**Robert A. Gray, Defendant and Appellant,**

and

**Ronald D. Vick, Defendant.**

No. 14675.

Supreme Court of South Dakota.

Argued Sept. 9, 1985.

Decided Jan. 29, 1986.

Thomas F. Burns, of Gribbin, Burns & Eide, Watertown, for defendants and appellees Woods.

Bruce M. Ford, Sioux Falls, for defendant and appellee O'Neill; Thomas J. Green, of Green, Schultz & Roby, Watertown, on brief.

Randall L. Seaver, of Morris & Fuller, P.A., Minneapolis, Minn., for defendant and appellant Gray; Arthur M. Hopper, of Austin, Hinderaker, Hackett & Hopper, Watertown, on brief.

HENDERSON, Justice.

## ACTION

This is a strict foreclosure action. It is made complicated by the cross-claims herein and creative financing. We have abridged the briefs so as to reduce an already technical and confused record. An appeal from Judgments entered on cross-claims against Robert Gray (Gray), appellant-defendant and cross-defendant herein, was perfected. We affirm in part, reverse in part, and remand. Essentially, we hold for Gray, who borrowed money and bought a motel by assuming a Contract for Deed, and then assigned, transferred, and delegated his interests and obligations to one Vick. Vick defaulted and is judgment proof. We are reversing judgments in favor of the assignor (Woods) and the lender (O'Neill), both of whom cross-claimed

against Gray and prevailed below. We affirm the trial court's ruling that Gray failed to properly raise the applicability of Minnesota usury law.

## FACTS

On June 30, 1980, plaintiff Lillian Varga (Varga) and Dean and Glenda Woods (Woods), defendants and cross-claimants, entered into a Contract for Deed, wherein the Woods agreed to purchase from Varga a motel located in Watertown.

On July 14, 1981, the Woods assigned their interest in the Varga Contract for Deed to Gray for $20,000 and certain gemstones which were to have a retail value of $101,000. In conjunction with this assignment, the Woods also quitclaimed their rights in the motel to Gray. After receiving an appraisal of the gemstones' value substantially less than the purported $101,-000, the Woods returned the gemstones to Gray. On July 28, 1981, Gray executed and delivered to the Woods a note for the principal sum of $46,000. This note, by its terms, was secured by the motel, although a security instrument evidencing this security was not agreed to.

In order to finance this assignment, Gray borrowed money from David O'Neill (O'Neill). On July 14, 1981, O'Neill gave Gray a check for $40,128.76 and Gray gave O'Neill a note for $61,000. The terms of this O'Neill-Gray note called for monthly installments until July 14, 1988. In conjunction with the O'Neill-Gray financial arrangements, Gray and O'Neill agreed that O'Neill would have a mortgage on the motel as security for the payment of the note. On July 27, 1981, Gray executed a mortgage on the motel in favor of O'Neill. This "Mortgage Deed" (a Minnesota form changed for use in South Dakota) was filed on July 28, 1981. On November 13, 1981, the Woods also filed a security instrument against the motel. This was denominated a Property Lien and it stated that it evidenced a lien against the motel property as intended by the Woods-Gray note. Gray, however, did not sign this instrument and was unaware of its filing.

On November 24, 1981, Gray and Ronald Vick (Vick) entered into and executed four separate agreements. The first, denominated Assignment of Purchasers' Interest Under Contract For Deed, assigned and transferred Gray's interest in the Varga Contract for Deed to Vick. The second, denominated Note Assumption, quitclaimed Gray's interest in the motel to Vick and assigned and delegated Gray's obligations under the Woods-Gray note to Vick, who agreed to assume said obligations. Under the third agreement, labeled Assignment of Mortgage, Gray assigned to Vick the O'Neill-Gray note and mortgage covering the motel. By the fourth agreement, denominated Assumption Agreement, Vick assumed and agreed to pay the indebtedness owed by Gray to O'Neill in accordance with the terms of the O'Neill-Gray note and mortgage. Neither O'Neill nor the Woods were privy to or had knowledge of these agreements when executed. Gray, after the execution of these four agreements, believed he had no further obligations under the original notes and mortgage. Vick, upon assuming these obligations, took over possession and operation of the motel.

After the execution of the Gray-Vick agreements, Vick soon became delinquent in his payment obligations. In early 1982, Vick initiated negotiations with O'Neill seeking to alter the terms of the original O'Neill-Gray obligations which Vick had assumed. During these negotiations, Vick's bankruptcy was mentioned and on June 4, 1982, O'Neill and Vick executed an Amendment to Assumption Agreement. This O'Neill-Vick agreement changed the obligations Vick assumed under the O'Neill-Gray note and mortgage by, inter alia, extending the due date of the final installment to May 15, 1992. Vick failed, however, to make payments under this O'Neill-Vick agreement. Gray was not privy to and did not have knowledge of this agreement when executed.

In late 1982, Vick also initiated negotiations with the Woods seeking to alter the terms of the original Woods-Gray obligations which Vick had assumed. Again,

Vick's bankruptcy was mentioned as an alternative to alteration. These negotiations culminated in the execution of three documents on November 1, 1982. The first document was a Promissory Note by Vick to the Woods in the amount of $38,351.57. The second document was a "Mortgage Deed" granting the Woods a mortgage on the motel in the same principal amount as the Woods-Vick note, and the third document was a Satisfaction of Property Lien in which the Woods released the property lien which they had filed on November 13, 1981. Vick, again, failed to make the required payments. Gray was not privy to and did not have knowledge of these agreements when executed.

On June 30, 1983, Varga filed suit in strict foreclosure naming the Woods, Gray, Vick, and O'Neill as defendants. The Woods cross-claimed against Gray. O'Neill cross-claimed against Gray and Vick. A bench trial was held on November 30, 1983, and Varga was awarded strict foreclosure. Vick failed to appear at these proceedings and was adjudged in default. By separate Judgments dated June 13, 1984, the trial court entered judgment against Gray on the Woods and O'Neill cross-claims in the amounts of $45,559.44 and $76,554.47, respectively. From these Judgments, Gray now appeals. Varga and Vick are not parties to this appeal. Gray presents ten legal issues. We only address the dispositive issues.

## DECISION

Before deciding the dispositive issues, it is necessary to determine the proper relationship of the respective parties.

As stated above, Gray gave the Woods and O'Neill notes evidencing his indebtedness. The initial relationship between these parties was thus that of debtor and creditors. Thereafter, however, Gray transferred, assigned, and delegated his rights and obligations under these instruments to Vick, who assumed and accepted responsibility for the same. Gray thus contends that he was transformed into a surety and that Vick was the principal debtor to the Woods and O'Neill.

The Woods and O'Neill do not arduously dispute Gray's surety contention and we find support therefor in 72 C.J.S. *Principal and Surety* § 40, at 532 (1951), which states:

A common instance of involuntary suretyship, at least as between the principal and surety themselves, occurs where one party to a contract, as a part of the agreement, assumes an indebtedness owing by the other to a third person, the one assuming the indebtedness becoming the principal, and the former debtor a surety....

... Even though the creditor is not a party to the agreement, it is made for his benefit and he is impliedly included as within the privity thereof, and, if he accepts such agreement, he is bound to observe and respect the relationship of principal and surety arising therefrom, unless it is otherwise specially contracted by the parties.

In the present case, Vick assumed Gray's indebtedness to the Woods and O'Neill and the Woods and O'Neill accepted this by thereafter receiving payments and negotiating terms with Vick. Thus, in this case, the relationship of the parties was that of creditors (the Woods and O'Neill), principal debtor (Vick), and surety (Gray).

## I.

IS THE VALIDITY OF THE O'NEILL-GRAY NOTE TO BE DETERMINED BY MINNESOTA LAW? WE HOLD THAT IT IS NOT.

The following facts are uncontroverted: (1) O'Neill and Gray are both Minnesota residents; (2) the negotiation, execution, and delivery of the O'Neill-Gray note transpired in Minnesota; and (3) all payments were due in Minnesota and all payments were made in Minnesota. Thus, under ordinary circumstances, Minnesota law would govern the validity of the O'Neill-Gray note and Gray's contention that the note is void as usurious under Minnesota

law would be sustainable. *See* SDCL 53–1–4 and *First Nat'l Bank of Sibley, Iowa v. Doeden,* 21 S.D. 400, 113 N.W. 81 (1907). However, if a party intends to rely on the possible application of another state's law, that party must give reasonable notice to the adverse parties. SDCL 19–8–4; *Associated Press v. Heart of Black Hills,* 325 N.W.2d 49 (S.D.1982). In *Heart of Black Hills,* this Court held the raising of the possible application of another state's law in briefs on appeal was not reasonable notice.

In the present case, counsel for Gray first raised the possible application of Minnesota usury law in his opening comments to the trial court. At this time, counsel for Gray also informed the trial court that copies of the relevant Minnesota statutes were attached to a memorandum that he had submitted that morning. O'Neill asserts that such does not constitute reasonable notice as contemplated by SDCL 19–8–4. The trial court found the notice requirements of SDCL 19–8–4 not to have been complied with and it refused to consider the application of the Minnesota statutes.

■ If a party intends to rely on the possible application of another state's law, that party must give reasonable notice to the adverse parties as required by SDCL 19–8–4. Raising the possible application of another state's law in opening comments to the trial court does not constitute reasonable notice. Able and prudent counsel will most assuredly discover the possible application of another state's law prior to the actual beginning of the trial. Requiring counsel to raise such contentions before the commencement of trial does not present a significant burden. We hold that counsel in the present case failed to provide reasonable notice as required by SDCL 19–8–4. We therefore affirm the trial court's refusal to consider the application of Minnesota usury statutes.

## II.

DID O'NEILL AND GRAY TRY, BY IMPLIED CONSENT, GRAY'S AFFIRMATIVE DEFENSE OF DISCHARGE? WE HOLD THAT THEY DID.

Gray asserts that because O'Neill extended the principal's or Vick's time for repayment, he, Gray, as surety, was discharged from his obligations to O'Neill. The trial court held, however, that it could not consider such an affirmative defense because Gray failed to plead it. On appeal, Gray contends that the trial court erred in failing to consider this defense because it was tried by the implied consent of the parties.

■ Under SDCL 15–6–8(c), a party's pleadings must affirmatively set forth matters constituting an avoidance or affirmative defense. If such an affirmative defense is not pleaded, it is waived. *American Property Services v. Barringer,* 256 N.W.2d 887, 890 (S.D.1977). SDCL 15–6–15(b), however, permits issues not asserted in the pleadings to be tried by the parties' express or implied consent, *Western Petroleum Co. v. First Bank Aberdeen,* 367 N.W.2d 773, 775 (S.D.1985), and the failure to formally plead an affirmative defense "is immaterial if the issue was tried by express or implied consent." *Barringer,* 256 N.W.2d at 890. In *Barringer, id.* at 891, this Court held:

The test for allowing an adjudication of an issue under ... SDCL 15–6–15(b) tried by implied consent is whether the opposing party will be prejudiced by the implied amendment, i.e., did he have a fair opportunity to litigate the issue, and could he have offered any additional evidence if the case had been tried on the different issue. (Footnote omitted; citation omitted.)

■ A review of the record herein supports Gray's contention. During opening comments to the court, Gray's counsel stated that its second defense to the O'Neill cross-claim was that the changes in the time for repayment under the O'Neill-Vick agreement of June 4, 1982, discharged Gray as surety. Counsel for O'Neill presented evidence on this point and in seeking admission of a particular item,

O'Neill's counsel noted Gray's discharge defense and argued for the admission of his evidence so as to rebut the same. We determine that O'Neill and Gray tried by implied consent the issue of discharge by the extension of time for repayment and that the trial court erred in failing to consider this affirmative defense. Counsel for Gray asserted this defense in opening comments to the trial court. Counsel for O'Neill was aware of this asserted defense and offered evidence to refute it. In fact, counsel for O'Neill asserted various justifications for the admission of this refutation evidence. O'Neill had a fair opportunity to litigate this issue and in fact litigated the same. The trial court erred in refusing to consider this defense.

## III.

DID EXTENSION OF TIME FOR REPAYMENT, GIVEN BY THE WOODS AND O'NEILL TO VICK, DISCHARGE GRAY FROM HIS OBLIGATIONS TO THE WOODS AND O'NEILL? WE HOLD THAT IT DID.

The Woods-Gray note had an original maturity date of March 1, 1987. Under the terms of the Woods-Vick note, however, the amount of the monthly installments and interest was reduced and it thereby extended the original maturity date by some 17 months. Under the O'Neill-Gray note, payments were to be made until July 14, 1988, at which time the entire balance was to be paid in full. Under the O'Neill-Vick Amendment to Assumption Agreement, however, the due date was extended to May 15, 1992. Gray asserts that because the Woods and O'Neill extended the principal's or Vick's time for repayment, he, Gray, as surety, was discharged from his obligations to the Woods and O'Neill. We determine that the Woods' and O'Neill's extension of time for Vick's repayment discharged Gray's original and surety obligations.

It has long been recognized by this Court "that a binding agreement between the creditor and the principal debtor, whereby the creditor extends the time for payment or performance, or agrees for a definite period to forbear or postpone the enforcement of his remedy, entirely discharges the surety, whether he is harmed thereby or not." *Zastrow v. Knight*, 56 S.D. 554, 560, 229 N.W. 925, 928, 72 A.L.R. 379, 383 (1930). *See also, Citizens State Bank v. Rosenwald*, 63 S.D. 50, 256 N.W. 264 (1934). In the present case, however, it could be contended that because the agreements between Vick and the Woods and O'Neill concerned pre-existing legal debts, there was no consideration, *Dawson v. Corbett*, 71 S.D. 106, 21 N.W.2d 758 (1946), and thus no "binding" agreements to extend the time for payment exist.

SDCL 57A–3–606(1)(a), however, which is identical to Uniform Commercial Code § 3–606(1)(a), provides:

(1) The holder discharges any party to the instrument to the extent that without such party's consent the holder

(a) Without express reservation of rights releases or agrees not to sue any person against whom the party has to the knowledge of the holder a right of recourse or agrees to suspend the right to enforce against such person the instrument or collateral or otherwise discharges such person, except that failure or delay in effecting any required presentment, protest or notice of dishonor with respect to any such person does not discharge any party as to whom presentment, protest or notice of dishonor is effective or unnecessary[.]

In interpreting this statute, it has been stated that while this subsection

does not expressly state that if the creditor grants an extension [of the time for payment], the surety is discharged, but the draftsmen intended that result. The surety, then, can claim discharge under 3–606 when, without his consent and without an "express reservation of rights," the creditor and debtor enter

into an agreement to extend time for payment.

J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code,* § 13–14, at 524–25 (2nd ed.1980). Several cases have also reached such a conclusion. *See,* e.g., *Lee Federal Credit Union v. Gussie,* 542 F.2d 887 (4th Cir. 1976); *Kellett v. Stanley,* 153 Ga.App. 854, 267 S.E.2d 282 (1980); *North Bank v. Circle Investment Co.,* 104 Ill.App.3d 363, 60 Ill.Dec. 105, 432 N.E.2d 1004 (1982); and *First Nat'l Bank of Layton v. Egbert,* 663 P.2d 85 (Utah 1983). "Sureties and persons in the position of sureties may claim the benefit of Code § 3–606", 6 R. Anderson, *Anderson on the Uniform Commercial Code,* § 3–606:7, at 565–66 (3rd ed. 1984), and an agreement to extend the time for payment discharges the surety, even where there is no consideration for the agreement. *See North Bank;* and *First Nat'l Bank of Layton.* This is because SDCL 57A–3–606(1)(a) and its U.C.C. counterpart only require that the creditor and principal debtor agree to suspend enforcement and does not require a "binding" agreement to suspend enforcement.

In the case at bar, the O'Neill-Vick Amendment to Assumption Agreement and the Woods-Vick note extended Vick's time for repayment without the consent of Gray and without an express reservation of rights by the Woods or O'Neill. We therefore hold that under SDCL 57A–3–606(1)(a), Gray was discharged from his obligations to the Woods and O'Neill. We therefore reverse and remand with instructions for the trial court to enter judgment for Gray consistent with the views herein expressed. Issues not specifically addressed are not dispositive of this appeal or are answered within the parameters of this decision.

Affirmed in part, reversed in part, and remanded.

FOSHEIM, C.J., MORGAN and WUEST, JJ., and HERTZ, Circuit Judge, Acting as Supreme Court Justice, concur.